(Nos. 84898, 84899 cons.—

ARCHER-DANIELS-MIDLAND COMPANY *et al.*, Appellees, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellants.

*Opinion filed December 3, 1998.*

BILANDIC and NICKELS, JJ., took no part.

John P. Kelliher, Special Assistant Attorney General, of Chicago, for appellant Illinois Commerce Commission.

David J. Rosso, Christopher W. Flynn and Thomas D. Brooks, of Jones, Day, Reavis & Pogue, of Chicago, for appellant Central Illinois Public Service Co.

Edward C. Fitzhenry, of Lueders, Robertson & Konzen, of Granite City, for appellees.

JUSTICE HEIPLE delivered the opinion of the court:

Central Illinois Public Service Company (CIPS) and the Illinois Commerce Commission (Commission) appeal the decision of the appellate court (293 Ill. App. 3d 459) reversing the Illinois Commerce Commission's order allowing the use of CIPS's fuel adjustment clause (FAC)[1] to recover costs associated with a fuel contract modifica-

---

[1] An FAC "is a tariff provision, approved by the commission in advance, as a policy option, whereby a change in certain fuel costs and incidental costs thereto will automatically permit a change in the price charged consumers, without the delay and expense of a

tion. We now reverse the judgment of the appellate court and hold that the fuel contract modification costs and associated carrying costs, or interest costs, are recoverable through an FAC.

## BACKGROUND

In 1975, CIPS entered into a long-term contract for the purchase of high-sulfur coal from AMAX Coal Company (AMAX). This contract, amended several times since 1975, provided that CIPS would purchase from AMAX's Delta Mine a minimum of 1.3 million tons of high-sulfur coal annually through December 31, 2002, for use in CIPS's Newton 1 generating unit. The initial price for the coal was fixed by the contract and was adjusted periodically through the use of preagreed escalators.

The primary source for the coal was AMAX's Delta Mine. However, the contract also allowed AMAX to deliver to CIPS coal from alternate sources so long as this coal was of the same or better quality as the Delta Mine coal. The contract did not allow CIPS to designate the source of this alternate source coal, and the contract price of the coal was not adjusted to reflect the actual cost of the alternate source coal to AMAX. Thus, any difference in contract price and market price accrued to the benefit of AMAX alone.

By 1993, the circumstances under which the contract was originally negotiated had significantly changed. First, the escalated cost of the high-sulfur coal from the Delta Mine contract significantly exceeded the market price of both high- and low-sulfur coal. Thus, AMAX was able to purchase alternate source coal on the open market and

formal regulatory hearing. This mechanism eases administrative burdens and reduces the likelihood of financial jeopardy of the utility during adverse economic conditions." *Adoption of Uniform Fuel Adjustment Clause(s)*, Ill. Commerce Comm'n Order 78—0457 (November 10, 1981).

resell that coal to CIPS at the higher contract price, thereby depriving CIPS of the benefits of the lower market prices for coal.

Second, the scrubber at CIPS's Newton 1 generating unit where the Delta Mine high-sulfur coal was burned was deteriorating and needed to be either renovated or retired. This scrubber reduced sulfur dioxide emissions to levels permitted by state and federal environmental laws and enabled CIPS to burn the high-sulfur coal. If the scrubber was retired, then CIPS could no longer burn high-sulfur coal, but instead could burn only low-sulfur coal which did not require the use of a scrubber. Although CIPS could renovate the scrubber rather than retire it, the cost was in excess of $70 million along with $10 million in annual operating costs.

Given the above-market price for the Delta Mine coal and the deterioration of the scrubber, CIPS began negotiations with AMAX in an attempt to restructure the Delta Mine contract. After considering various options, CIPS concluded that the most cost-effective option was to retire the Newton 1 generating unit scrubber and restructure the Delta Mine contract to allow the purchase of low-sulfur coal.

The restructured agreement provided that CIPS could locate and negotiate with third-party coal suppliers. AMAX would then purchase this alternate source coal at market price, and resell the coal to CIPS with no mark up. Consequently, under the modified contract, CIPS would receive the benefit of lower market prices for alternate source coal. Additionally, CIPS could purchase low-sulfur coal, thereby eliminating the need for the deteriorating scrubber and saving the renovation costs. Finally, CIPS would not be required to purchase a minimum amount of coal in any year, but instead would have an open-ended obligation to eventually purchase 7.8 million tons. CIPS anticipated satisfying this obligation by the end of 2002.

In return for these contract modifications, CIPS agreed to pay AMAX a one-time payment of $70 million, an amount CIPS would finance itself at an annual interest rate of approximately 7.25%. The modified agreement, however, was contingent upon a finding by the Commission that the payment and carrying costs could be passed on to CIPS's customers through the FAC. Consequently, CIPS sought the Commission's approval. Appellees, Archer-Daniels-Midland Company, Marathon Oil Company, and Quantum Chemicals Company, collectively known as the Illinois Industrial Energy Consumers, intervened in the proceedings to challenge CIPS's proposal to pass the contract modification costs through the FAC.

In the proceedings before the Commission, CIPS produced evidence that in the period between 1996 and 2015, the contract modifications would produce a "Present Value of Revenue Requirements" of approximately $128 million less than renovating the scrubber and continuing the use of high-sulfur coal under the Delta Mine contract terms. Ninety-four percent of these benefits would be realized by customers between 1996 and 2005.

CIPS proposed to pass both the $70 million payment and the savings resulting from the contract restructuring through its FAC. The payment and carrying costs would be passed through the FAC by applying an $11.09 prepayment charge for each ton of coal purchased, up to a total of 7.8 million tons. This "prepayment/ton" charge, however, would be offset by the resulting savings from the contract restructuring. Thus, CIPS estimated that its customers would realize a savings of $4.5 million through the FAC in 1997 alone, a 4.6% reduction in the overall retail FAC charge for that year. Over the life of the contract, CIPS anticipated that its customers would realize a total net savings through the FAC of approximately

$14 million. Finally, CIPS proposed that if its estimate of savings to customers was overly optimistic, it guaranteed that customers would not pay an amount in excess of the amount they would have paid had the Delta Mine contract not been restructured. In other words, CIPS guaranteed the Commission that in a worst case scenario, CIPS's customers would pay the same amount for fuel as they did under the original Delta Mine Contract.

The Commission ultimately approved both the contract modification and the passing of the payment and associated carrying costs through the FAC. In approving the use of the FAC, the Commission found that the payment of $70 million and associated carrying costs were incurred by CIPS directly in realizing fuel savings over the life of the AMAX coal contract. Using the FAC would allow customers who experience reduced FAC charges via the contract modifications to also pay the costs of reducing those FAC charges. Moreover, the Commission found that allowing the use of the FAC in this context would encourage the buying-out or restructuring of uneconomic contracts.

The appellate court, however, reversed the order of the Commission. The appellate court found that the restructuring cost was not a "direct cost of fuel," and the cost could therefore not be passed through the FAC. Secondly, the appellate court held that the decision of the Commission constituted improper single-issue ratemaking. Accordingly, the appellate court disallowed CIPS from passing the contract restructuring costs through the FAC.

## ANALYSIS

In reviewing an order of the Commission, "[t]he findings and conclusions of the Commission on questions of fact shall be held *prima facie* to be true and as found by the Commission [and] rules, regulations, orders or decisions of the Commission shall be held to be *prima facie*

reasonable \*\*\*." 220 ILCS 5/10—201(d) (West 1996). Indeed, the Commission is entitled to great deference because it is an administrative body possessing expertise in the field of public utilities. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994). However, the Commission's interpretation of a question of law is not binding on a court of review. *United Cities Gas*, 163 Ill. 2d at 12.

Section 9—220 of the Illinois Public Utilities Act (Act) states:

"Notwithstanding the provisions of Section 9—201, the Commission may authorize the increase or decrease of rates and charges based upon changes in the *cost of fuel* used in the generation or production of electric power \*\*\* through the application of fuel adjustment clauses \*\*\*."

(Emphasis added.) 220 ILCS 5/9—220 (West 1996). Given this statutory language, the contract restructuring cost and associated carrying costs may be passed to consumers through the use of an FAC if these costs are "costs of fuel."

The Illinois Administrative Code (Code) states that "costs of fuel" include "direct cost[s] of fuel." 83 Ill. Adm. Code § 425.40(c)(1) (1996). Specifically, section 425.40(c)(1) provides:

"The cost of fuel *shall include* the direct cost of fuel delivered at the generating plants. The direct fossil fuel costs are limited to costs entered into fuel expense Accounts #501 and #547 which have been cleared upon consumption from Fuel Stock account #151[.]" (Emphasis added.) 83 Ill. Adm. Code § 425.40(c)(1) (1996).

Additionally, the Commission's order adopting a uniform fuel adjustment clause provides guidance as to what items may properly be flowed through an FAC as a "cost of fuel." *Re Uniform Fuel Adjustment Clauses*, 45 Pub. Util. Rep. 4th 1 (1981) (UFAC order). In setting forth the purposes of an FAC, the UFAC order states:

"Fuel costs represent a substantial portion of operating costs; in some instances, fuel costs alone comprise more

than half of a utility's total operating costs. Any fluctuation in fuel costs has a significant impact on a utility's earnings unless some means exists to recoup these increased costs as quickly as possible. These fuel costs are a highly volatile expense item; more so than other expenses such as wages or maintenance. When the volatility factor is coupled with the magnitude of the fuel costs, one can readily conclude that the fuel adjustment clause is both a necessary and a proper regulatory tool to insure that both the customer and the utility receive the benefits of early recognition of changes in the cost of generating electricity." 45 Pub. Util. Rep. 4th at 4.

The appellate court interpreted this language as requiring that only "direct costs of fuel" due to uncontrolled fluctuations in fuel prices beyond the control of a utility may be passed through an FAC. While we agree that one of the purposes of an FAC is to ameliorate the adverse effects of uncontrolled fuel price fluctuations, the UFAC order as a whole does not support such a limited use for an FAC.

The Commission in adopting the UFAC expressed concern that the use of FACs would discourage prudent purchasing of fuel by removing incentives for utilities to bargain for the lowest procurement prices. 45 Pub. Util. Rep. 4th at 19 (stating that "[i]t is absolutely essential, if fuel adjustment clauses are to be used correctly, that the manner by which a utility acquires, handles, and accounts for fuel supplies be wholly prudent and defensible"). Stated another way, a utility's profits are not adversely affected by increased fuel costs if those costs can be directly passed on to consumers.

Given this potential for disincentive, the Commission stressed in the UFAC order that utilities must engage in prudent purchasing practices:

"A utility's capacity to address both near and long-term fuel requirements requires an effective planning and decision model by production and planning personnel which will consider load forecasting, operating performance of

plants, fuel mix, fuel prices, transportation costs, and variations in load requirements. Other factors such as fuel availability outlook, alternative fuel source options, and changes in regulatory requirements are part of the model. ***

* * *

Fuel contracts must and will be constantly monitored by the utilities to insure and review fuel quantity and quality control, sizing of fuel stock levels, charging of proper prices, and correct administration of price escalation provisions." (Emphasis added.) 45 Pub. Util. Rep. 4th at 20.

Relying upon this language, the Commission in *Illinois Commerce Comm'n v. Interstate Power Co.*, Ill. Commerce Comm'n Order 92—0335 (September 25, 1996), allowed a utility to flow a contract buy-out cost through its FAC as a "cost of fuel." In deciding whether this recovery mechanism was permissible, the Commission found that allowing the pass-through of the buy-out cost was consistent with the spirit of the UFAC. Specifically, allowing the pass-through would foster prudent purchasing practices by encouraging the efficient use of resources and encouraging utilities to alter uneconomic contracts. *Interstate Power*, Ill. Commerce Comm'n Order 92—0335 (September 25, 1996).

Although *Interstate Power* explicitly stated that the decision was "for the purposes of this docket only," the Commission in the present case found that *Interstate Power*'s rationale applied with equal force to the present case. We agree.

The $70 million payment and associated carrying costs in the present case were incurred by CIPS in an attempt to reduce the cost of fuel to its customers. CIPS was free to leave the uneconomic Delta Mine contract unaltered. However, CIPS, by engaging in "prudent purchasing" practices, monitored its contract and sought to change it when it became disadvantageous to its customers. This is precisely the type of prudent contract monitoring which the Commission sought to encourage

in the UFAC order. Indeed, disallowing the flow-through in this case would create the very danger about which the Commission was concerned when it adopted the UFAC, namely, removing incentives for utilities to engage in prudent purchasing practices.

Although respondents argue that the contract restructuring was motivated by the nonfuel savings realized by the retirement of the scrubber, we find that costs of a fuel contract modification which produce nonfuel *as well as* fuel savings may be appropriately flowed through an FAC. As stated in the UFAC order, prudent fuel purchasing by a utility requires it to consider numerous factors in assessing the benefits of its fuel procurement practices. 45 Pub. Util. Rep. 4th at 20 (stating that a utility should, in assessing near- and long-term fuel requirements, consider factors such as operating performance of plants, alternative fuel source options, and changes in regulatory requirements). Thus, CIPS was not required to consider the benefits of the contract restructuring in a vacuum. Rather, CIPS was free to choose the contract modifications which produced the greatest amount of overall savings, both fuel and nonfuel. Consequently, the contract restructuring costs are "costs of fuel" as contemplated in the UFAC order and section 9—220 of the Act (220 ILCS 5/9—220 (West 1996)), regardless of whether CIPS realizes nonfuel benefits from the contract restructuring.

We also disagree with the appellate court's conclusion that the Commission's refusal to allow entry of the contract restructuring costs in "Fuel Stock Account #151" "demonstrates that recovery is not proper through the FAC." 293 Ill. App. 3d at 466. Section 425.40(c)(1) of the Code limits "direct fossil fuel costs" to costs which have been cleared upon consumption from account No. 151. 83 Ill. Adm. Code § 425.40(c)(1) (1996). The Commission concluded that, although the restruc-

turing cost may be flowed-through the FAC, the costs were not "fuel stock" and could not therefore be entered into account No. 151.

The Commission's conclusion that the contract restructuring costs were not classifiable as "fuel stock" does not imply that these costs may not be passed through an FAC. Although section 425.40(c)(1) limits "direct" costs of fuel to costs cleared from consumption from account No. 151, the category of costs passable through an FAC is broader than "direct" costs of fuel. Indeed, the language of section 9—220 of the Act requires only that a recoverable cost be a "cost of fuel." 220 ILCS 5/9—220 (West 1996). Consequently, at most the Commission's accounting treatment evidences its belief that the contract restructuring costs were not "direct" costs of fuel. However, as already shown from the language of the UFAC order and section 9—220 of the Act (220 ILCS 5/9—220 (West 1996)), "costs of fuel" recoverable via an FAC are not limited to "direct" costs. See 83 Ill. Adm. Code § 425.40(c)(1) (1996) (stating that "cost of fuel shall *include* direct costs of fuel" (emphasis added)). Therefore, the Commission's accounting treatment does not alter our conclusion that the contract modification costs may be passed through an FAC as "costs of fuel."

Finally, we also find the appellate court erred when it held that the decision of the Commission resulted in improper single-issue ratemaking. In a general base rate proceeding, the rule against single-issue ratemaking requires that the Commission "examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement." *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 138 (1995). However, this rule does not apply "except in the context of a complete base rate proceeding." *Citizens Utility Board*, 166 Ill. 2d at 137 (holding that the prohibition of

single-issue ratemaking does not apply in relation to the use of rider mechanisms). It is undisputed that the proceeding before the Commission was not a complete base rate proceeding. Thus, the rule against single-issue ratemaking has no application in the present case.

In sum, we hold that contract restructuring costs and associated carrying costs are "costs of fuel." As such, the costs may be recovered through the use of an FAC.

## CONCLUSION

For the reasons stated, the judgment of the appellate court is reversed and the order of the Commission is confirmed.

*Appellate court judgment reversed;*
*Commission order confirmed.*

JUSTICES BILANDIC and NICKELS took no part in the consideration or decision of this case.