# Illinois Official Reports

## Appellate Court

*Citizens Utility Board v. Illinois Commerce Comm'n*, 2015 IL App (2d) 130817

| | |
|---|---|
| Appellate Court Caption | CITIZENS UTILITY BOARD, Petitioner, v. ILLINOIS COMMERCE COMMISSION; THE PEOPLE *ex rel.* THE ATTORNEY GENERAL OF THE STATE OF ILLINOIS; ENERGY-KOCH TRADING, L.P.; NORTHERN ILLINOIS GAS COMPANY, d/b/a Nicor Gas Company; INTERSTATE GAS SUPPLY ASSOCIATION (ConEd Solutions Direct Energy Services, LLC, Exelon Energy Company, GDF SUEZ Energy Resources NA, Inc., Glexa Energy, Green Mountain Energy Company, Hess Corporation, Integrys Energy Services, Inc., Just Energy, Liberty Power, RRI Energy, and Sempra Energy Solutions LLC), Respondents. |
| District & No. | Second District<br>Docket No. 2-13-0817 |
| Filed | May 14, 2015 |
| Decision Under Review | Petition for review of order of Illinois Commerce Commission, Nos. 01-0705, 02-0067, 02-0725 cons. |
| Judgment | Affirmed. |
| Counsel on Appeal | Julie L. Soderna and Christie R. Hicks, both of Citizens Utility Board, of Chicago, for petitioner.<br><br>James E. Weging, of Illinois Commerce Commission, of Chicago, for respondent Illinois Commerce Commission.<br><br>John E. Rooney, John P. Ratnaswamy, and Anne W. Mitchell, all of Rooney Rippie & Ratnaswamy LLP, of Chicago, for respondent Northern Illinois Gas Company. |

| Panel | PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
| | Justices Hutchinson and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    On June 5, 2013, following review of an alternative rate regulation program pursuant to section 9-244(c) of the Public Utilities Act (Act) (220 ILCS 5/9-244(c) (West 2012)), the Illinois Commerce Commission (Commission) ordered Northern Illinois Gas Company, d/b/a Nicor Gas Company (Nicor), to refund $72,149,519 to its customers based on certain improprieties that occurred during the pendency of the program. On appeal, the Citizens Utility Board (CUB) argues that the Commission applied an improper standard of proof and that Nicor customers are entitled to an additional $155 million in damages based on alleged manipulation of storage withdrawals in 2001. We affirm the Commission's decision.

¶ 2                                   BACKGROUND

¶ 3    On March 1, 1999, Nicor filed a verified petition seeking the Commission's approval, under section 9-244 of the Act (220 ILCS 5/9-244 (West 1998)), of an alternative rate regulation program, which it termed the "Gas Cost Performance Program" (GCPP). The Commission approved the GCPP with modifications in an order entered on November 23, 1999. The GCPP was in effect from January 1, 2000, until December 31, 2002.

¶ 4    Under the GCPP, each calendar year, Nicor's total actual annual purchased gas costs were compared with an annual gas cost "benchmark," which was meant to approximate the gas costs that Nicor would have incurred under traditional rate regulation. The benchmark reflected the market price for the gas when it was sold to customers. It incorporated the market index cost of gas less certain adjustments, to reflect other factors impacting the costs Nicor incurred to provide gas to its customers. One such adjustment was a storage credit adjustment (SCA), which accounted for the seasonal price differential between lower-cost summer months and higher-cost winter periods. The withdrawal percentages under the SCA were based on Nicor's historic storage withdrawal activity during the years 1994-98. By withdrawing less than it had historically, Nicor could raise the benchmark. By withdrawing more than it had historically, Nicor could lower the benchmark.

¶ 5    Under the GCPP, savings or losses experienced by Nicor based on the actual cost of gas in comparison to the benchmark were to be shared on a 50-50 basis between Nicor and its customers. If the benchmark exceeded actual gas costs over a given year, Nicor and its customers each received 50% of the difference. If the benchmark was less than the actual gas costs, Nicor and its customers each had to pay 50% of the difference.

¶ 6    Natural gas utility companies typically withdrew gas from storage during the winter when the demand and cost for gas were higher, and replenished the storage supply during the summer when gas prices generally declined. Nicor had significant underground storage of natural gas. Nicor used a last-in, first-out (LIFO) method of accounting for gas storage

inventory. Under this method, the inventory was considered to exist in layers, with each layer priced at its cost in the year it was added to storage. When gas was withdrawn from storage, the most recent layer added was considered the layer withdrawn for accounting purposes. Whether a layer was added was always determined at the end of the year, by considering overall storage additions versus withdrawals. If more gas was added than withdrawn from storage, a LIFO storage layer was created. Over time, Nicor had accumulated large stores of low-cost LIFO gas on its books, which were estimated to be worth several hundred million dollars.

¶ 7 Before applying for the GCPP, Nicor created an "inventory value team" to investigate how Nicor could benefit from the low-cost gas in storage. Under traditional rate regulation, referred to as purchased gas adjustment (PGA) regulation, ratepayers would have received 100% of the benefit of the low-cost LIFO gas. In the middle of 1998, the inventory value team issued a report recommending that Nicor pursue a performance-based regulatory program (PBR), such as the GCPP, which would allow Nicor to share in the benefit of the low-cost LIFO gas. In the Commission's proceedings that resulted in the approval of the GCPP, Nicor failed to reveal this information when it was questioned as to the extent to which it would profit under the GCPP.

¶ 8 On January 24, 2002, the Commission entered an initiating order (Docket No. 02-0067) to review the GCPP, pursuant to section 9-244(c) of the Act, which required that the Commission review any approved program two years after its implementation to determine whether it was meeting its objective. On June 10, 2002, following the submission of testimony and an evidentiary hearing, the record was marked "Heard and Taken." CUB then received an anonymous "whistleblower" fax containing allegations about the operation of the GCPP. Thereafter, Nicor and all other parties agreed to reopen the case and resume discovery. On July 16, 2002, the Commission entered an interim order allowing discovery to proceed.

¶ 9 In response to the whistleblower fax, Nicor formed a special committee to investigate its GCPP activities. The committee hired Scott R. Lassar of Sidley, Austin, Brown and Wood (Sidley) to investigate Nicor's GCPP activities. On October 28, 2002, Sidley filed with the committee a report, authored by Lassar (the Lassar report), presenting its findings and conclusions. The Lassar report concluded that Nicor's GCPP activities had adverse consequences for customers and it recommended certain adjustments to eliminate those consequences. In the report, Lassar noted that Nicor's 2001 storage withdrawals were well below historic estimates. However, he "did not find evidence indicating that this was because of improper attempts to manipulate the storage cycle." He noted that December 2000 was exceedingly cold. In January 2001, based upon Nicor's concerns that it would be another exceedingly cold month, Nicor obligated itself to buy large quantities of gas at historically high prices so that it would ensure service to customers for the rest of the winter. However, January 2001 was warm. Lassar also noted that due to high gas prices in the fall/winter of 2001, when Nicor would normally have sold its storage gas to ratepayers, it instead provided cheaper, flowing gas to customers.

¶ 10 On December 9, 2002, the parties filed a joint motion to reopen the record in docket No. 02-0067 and expand the scope of the proceeding. On December 17, 2002, in a second interim order, the Commission reopened the record and decided that additional issues related to the PGA regulation for the years 1999-2000 would be reviewed based on new and relevant information. The Commission also declared that "this proceeding is the appropriate formal mechanism to consider the totality of issues currently before this Commission as a result of the

operation of the GCPP program, including the transactions occurring in 1999." The Commission further stated that it was reopening the record to consider:

> "all issues relating to the operation of the [GCPP] Nicor Gas implemented *** in accordance with the Commission's order entered November 23, 1999, in Docket 99-0127, and all issues relating to any refunds that may be owing to Nicor customers *** as a result of the operation of the [GCPP] in 1999, 2000, 2001, and 2002, and for ordering such other and further relief as deemed equitable and just."

¶ 11 The Commission was required to conduct annual hearings ("reconciliation proceedings") to (1) examine whether Nicor's rates reflected the costs of purchased gas, in order to determine whether such purchases were prudent, and (2) reconcile any amounts collected with the actual costs of gas. 220 ILCS 5/9-220(a) (West 2002). The Commission consolidated docket No. 02-0067 with Nicor's then-pending reconciliation proceedings of its actual gas costs for the years ending December 31, 2001 (docket No. 01-0705), and December 31, 2002 (docket No. 02-0725).

¶ 12 Thereafter, evidentiary hearings in this case were suspended pending litigation in the circuit court of Cook County to obtain copies of materials related to the GCPP that were in the possession of a Texas-based entity. The materials were ultimately produced in December 2006. Proceedings in this case then resumed.

¶ 13 Commencing in August 2009, CUB, the Illinois Attorney General (AG), the staff of the Commission (Staff), and Nicor each sponsored direct and surrebuttal testimony. Relevant to this appeal, Dr. Paul Carpenter, David Moes, and Christopher Gulick testified on behalf of Nicor. David Effron testified on behalf of the AG. James Mierzwa testified on behalf of CUB. CUB identified 11 different issues that required refunds to correct Nicor's inappropriate actions under the GCPP. The refunds were intended to adjust the benchmark to place customers in the position they would have been absent the improper activity. Of these 11 issues, Staff witnesses provided essentially similar testimony as to 8. On February 16, 2012, on those eight issues, Staff and Nicor stipulated to an amount of refunds ($64 million) due to Nicor's customers. On February 28 and 29, and March 1, 2012, evidentiary hearings were held before the Commission, at which the direct and surrebuttal testimony taken by the parties was admitted into evidence. The relevant testimony is as follows.

¶ 14 Testimony of CUB Witness James Mierzwa

¶ 15 On August 14, 2009, Mierzwa testified that he was a principal and vice president of Exeter Associates, Inc., a company specializing in providing public-utility-related consulting services. He had worked at Exeter since 1990 and specialized in evaluating the gas purchasing practices and policies of natural gas utilities. Mierzwa testified that Nicor improperly manipulated the GCPP and its results. He opined that, under the GCPP, Nicor could lower or raise storage withdrawals to affect the benchmark. He opined that Nicor purposely reduced the storage withdrawal cycle in 2001 when it was not in the best interest of its customers.

¶ 16 As an example of how customers' interests were not aligned with the GCPP, Mierzwa testified that in September 2001 the cost of gas in storage was $3.35 per dekatherm (Dth) and that the cost of flowing supplies in November and December 2001 was $2.77 and $3.14 per Dth, respectively. At the same time, the storage credit rate was about $2.85 per Dth. As such, the benchmark would be reduced by $2.85 for each Dth of gas withdrawn from storage. Under

the GCPP, 50% of the reduction in the benchmark would have accrued to customers, which would have been $1.42 per Dth, which exceeded the savings estimated by Nicor of $0.40 per Dth (by purchasing flowing gas). Under these circumstances, customers would have been better off had Nicor continued to withdraw gas from storage. Based on the improper reduction in storage withdrawals in 2001, Mierzwa opined that ratepayers were entitled to a refund of $155.3 million.

¶ 17    On October 7, 2011, in surrebuttal, Mierzwa reiterated that Nicor was able to significantly manipulate its storage withdrawal activity and pointed out that withdrawals in 2001 were about half of the withdrawals in 2000. He did not believe that cold weather or a possible compromise to reliability could explain Nicor's storage withdrawal decisions. Mierzwa opined that Nicor's storage withdrawal decisions were influenced by a desire to beat the benchmark (by keeping monthly storage withdrawals as close as possible to the percentages set under the SCA component of the benchmark) and also to access low-cost LIFO gas in storage inventory. As compared to historical data, a chart showed, the monthly storage withdrawal in November 2000 was unusually high and in the first three months of 2001 was unusually low.

¶ 18    Mierzwa further testified as to factors that affected Nicor's gas purchasing decisions in November 2000. First, colder-than-normal temperatures increased gas sales by about 13% and gas prices became unusually high. Accordingly, Nicor increased storage withdrawal in November 2000 by 80% above planned withdrawals and the historical average level of withdrawals. In December 2000, severe cold weather once again increased sales above planned levels by about 25%. Additionally, gas prices continued to increase significantly, with an average daily price almost twice normal. Despite these issues, Nicor did not increase withdrawals in December as it had in November. Mierzwa believed that Nicor's argument, that it had withdrawn so much extra gas from storage in November that it could not do so in December, was misleading and incomplete. Mierzwa opined that Nicor reduced contract storage injections in 2000 so that it could lower inventories as a means to access the low-cost LIFO layers. (Storage inventory consisted of both on-system storage and contract storage.) Mierzwa pointed out that contract storage inventory in October 2000 was half of its historical average level and that in December 2000 it was only 22% of its historical average. Mierzwa opined that, because Nicor failed to increase contract storage in the summer of 2000, inventory levels were depleted and ratepayers were adversely affected.

¶ 19    Mierzwa also noted that "Hub services" reduce the storage capacity available to ratepayers. Hub services include park and loan services. In a park transaction, a third party delivers gas to Nicor for storage and the gas is returned to that third party at a later date. A loan transaction is the opposite. Mierzwa testified that Nicor's Hub services during the GCPP period affected the storage inventory levels and thus the amount of gas available to ratepayers during 2001. Specifically, in the summer of 2000, Nicor accepted and stored 13.7 billion cubic feet (Bcf) of gas for third parties. That gas was withdrawn and returned by mid-February 2001. That gas was thus unavailable to serve customers during the winter of 2000-01. In February and March 2001, Nicor loaned 8.0 Bcf of gas to third parties, decreasing the storage withdrawals available to customers and thereby increasing the gas costs to customers (who had to purchase gas at much higher market prices).

¶ 20    Finally, Mierzwa opined that Nicor's explanation that low storage withdrawals in January 2001 were weather-related should be viewed with skepticism. In January 2003 more gas was withdrawn from storage despite the fact that December 2002 inventory levels were lower than

December 2000 inventory levels. On cross-examination before the Commission on February 28, 2012, Mierzwa admitted that he had never managed storage inventories for gas distribution utilities. He acknowledged that, if storage assets were mismanaged, there could be catastrophic results.

¶ 21                         Testimony of AG Witness David Effron

¶ 22     David Effron provided testimony on behalf of the AG. However, in its brief on appeal, CUB provides limited cites to Effron's testimony in support of its arguments. As such, we have declined to include Effron's testimony in its entirety. In sum, Effron agreed with Mierzwa that, in 2001, the deviation from the historical pattern of injections and withdrawals increased the costs of gas delivered to customers.

¶ 23            Testimony of Nicor Witnesses David Moes and Christopher Gulick

¶ 24     On April 29, 2011, David Moes and Christopher Gulick provided testimony on behalf of Nicor. Moes testified that he worked for Navigant Consulting, Inc. (NCI), as a managing director and had over 26 years' experience as an accountant. He had 23 years' experience in "developing and applying quantitative analyses of business operations, and presenting these analyses in litigated proceedings." Gulick testified that he worked for Bates White, a specialized economic consulting firm with expertise related to energy. He had over 30 years' experience in the North American energy industry, with a primary focus on natural gas and oil. He had direct experience in natural gas supply management and operations, assessing natural gas markets and pricing, and storage valuation.

¶ 25     Moes and Gulick testified that Nicor's storage activity was evaluated in two ways: (1) in light of the storage activity that occurred across the United States in 2001, and (2) in terms of what the increased withdrawals would have implied with regard to managing gas resources. Moes and Gulick concluded that Nicor's 2001 storage withdrawals were consistent with the storage withdrawals seen across the country due to the warmer temperatures that year. As compared to natural gas inventories nationwide (based on data maintained by the United States Energy Information Administration (EIA) from 1997 to 2004), Nicor's 2000 and 2001 storage inventories followed a pattern similar to the national pattern, strongly implying that Nicor's storage withdrawals were not influenced by considerations related to the GCPP.

¶ 26     Moes and Gulick opined that, if Nicor had increased storage withdrawals in 2001 as asserted by Mierzwa, it would have driven inventory to extremely low levels, would have been deviating from its operating practices, and could have impacted operational safety. Additionally, the unusually low operating level could have compromised Nicor's ability to meet customer demand. They opined that Mierzwa failed to consider operational realities or constraints.

¶ 27     Relying on data compiled by the Commission, Moes and Gulick concluded that, compared to other major natural gas utility companies in Illinois, Nicor's average price of gas was the lowest among its peers from 1995 to 2004, except in 2001, when Nicor's average gas price was still second lowest.

¶ 28     On December 20, 2011, in surrebuttal testimony, Moes and Gulick opined that Nicor's effort to access low-cost LIFO layer gas was conducted through accounting mechanisms and was not related to storage withdrawal activity in 2000 and 2001. They pointed out that this was

consistent with the Lassar report, which concluded that the accounting treatment of prefill storage transactions was the mechanism used to access low-cost LIFO gas. Moes and Gulick noted that multiple regulators and auditors had scrutinized Nicor's actions under the GCPP and that none of them disputed the Lassar report's conclusion on this issue.

¶ 29 Moes and Gulick reiterated that Nicor's 2000 and 2001 storage withdrawal activity was necessitated by weather, market conditions, and operational requirements and was not undertaken with a desire to manipulate the benchmark. The fact that Nicor customers enjoyed competitive rates during the GCPP demonstrated that Nicor was not mismanaging or "manipulating" storage withdrawals to its benefit and to the detriment of customers. Moes and Gulick did not agree with Mierzwa's assessment of the effect of Hub services on storage inventory levels. Although Nicor might have had custody of third-party gas, it did not hold title to that gas. If Nicor wanted to purchase that gas, it likely would have paid the market price. As such, there was no economic difference between buying stored gas from third parties and purchasing flowing gas. On March 1, 2012, Moes and Gulick testified before the Commission consistently with their direct and surrebuttal testimony.

### Testimony of Nicor Witness Dr. Paul Carpenter

¶ 31 On April 29, 2011, Carpenter testified that he had a doctorate in applied economics, a master's degree in management, and a bachelor's degree in economics. He had 25 years' experience in research and consulting on the economics and regulation of the natural gas industry. He was asked by Nicor to evaluate Mierzwa's testimony. Carpenter opined that Mierzwa's evaluation was based on hindsight rather than on the market conditions that were known or anticipated by Nicor when its actions were taken.

¶ 32 In response to Mierzwa's claim that had Nicor, in 2001, followed historical withdrawal activity it would have produced lower gas costs for customers, Carpenter opined that market conditions had changed significantly in 2001 and that it would be inappropriate to impose a historical standard retroactively. Data indicated that monthly gas prices, which were generally $2 to $3 per million British thermal unit (Mmbtu), reached $10.94 per Mmbtu in January 2001. This was a highly unusual and unexpected gas price spike. Such gas price fluctuations had not occurred during the years that were the basis for Mierzwa's damages calculation related to the allegedly improper 2001 storage withdrawals. Carpenter opined that Mierzwa's damages calculation was based almost entirely on this unexpected event. For example, of Mierzwa's $155 million in damages, $142 million was derived from one month–January 2001.

¶ 33 Carpenter further testified that Mierzwa failed to consider market conditions and storage inventory. December 2000 was the second coldest December in Chicago since 1872. Carpenter pointed to an EIA report that found that, in the winter of 2000-01, frigid temperatures caused a surge in demand that led to soaring prices and a rapid drawdown of storage inventories. The EIA report also stated that "[r]ising prices at the beginning of the natural gas storage refill season in April 2000 resulted in lower levels of injections than normal and unusually low levels of natural gas in storage at the start of the 2000-2001 winter." Carpenter testified that in November and December 2000 Nicor withdrew historically large volumes of gas from storage, which kept prices low in those months. As a result, Nicor's storage inventory at the end of 2000 was at its lowest year-end level since 1994. Carpenter opined that Nicor managed its January 2001 storage withdrawals to ensure that it had the ability to meet its winter reliability obligations–not to improve its performance under the GCPP. The more likely explanation for

Nicor's January 2001 storage withdrawals was that the low inventory at the end of 2000 restricted Nicor's ability to withdraw at the same levels as it had in the past.

¶ 34    On December 20, 2011, in surrebuttal, Carpenter testified that the inventory level at the end of October 2000 was consistent with historical inventories and, thus, there was no support for the assertion that Nicor started the winter withdrawal season with an unreasonably low level of gas in storage so as to position itself to access LIFO layers. Further, Carpenter testified that Nicor's low storage inventory level at the end of 2000 was consistent with what was happening to gas storage inventories across the country at that time. This suggested that Nicor acted properly and that the incentives in its GCPP were not out of line with the incentives faced by users of gas storage services across the country.

¶ 35    According to Carpenter, the evidence indicated that Nicor's strategy to access low-cost LIFO gas was through the use of "pre-fill" storage deals. He noted that this conclusion was supported by the Lassar report. Carpenter testified that the GCPP was designed such that all storage withdrawal activity impacted the benchmark, but this did not mean that managing the withdrawal activity was "manipulative."

¶ 36    Finally, Carpenter responded to Mierzwa's claim that January 2003 withdrawals were higher than January 2001 even though year-end inventory in 2002 was lower than in 2001. Carpenter testified that this example highlighted the danger of using historical data to support an argument about what "should have been done." Carpenter explained that, while total net withdrawals in January through April 2001 and 2003 were 30.3 Bcf and 35.9 Bcf, respectively, Mierzwa's 2001 damages calculation assumed that withdrawals should have been 73.8 Bcf in January through April 2001–more than double the withdrawals in Mierzwa's reference year of 2003. Moreover, if Mierzwa's damages calculation had adopted the entire 2003 injection and withdrawal profile, his calculation would have been only $17 million instead of $155 million.

¶ 37    On March 1, 2012, before the Commission, Carpenter acknowledged that the contract storage inventory at the end of October 2000 was 45% of the historical four-year average. Nonetheless, Carpenter testified that this was not meaningful, as total storage inventory was still in line with historical data.

¶ 38                        Commission's Determination

¶ 39    On February 16, 2012, Nicor and Staff entered a stipulation forming the basis for refunds from Nicor to its customers in the amount of $64 million. On June 5, 2013, the Commission entered its written order acknowledging the stipulation of $64 million. However, there remained requested refunds to which Nicor did not stipulate. On one of those issues (termed "Delivered Storage Service Withdrawals"), the Commission ordered an additional $8 million in damages, bringing the total damages to $72 million.

¶ 40    Relevant to the claim on appeal in this case, the Commission denied CUB's and the AG's damages requests as to allegedly improper gas storage withdrawals in 2000 and 2001. The Commission concluded that, "[w]hile the intentions of [Nicor] during the implementation of this program are certainly subject to question, there are no conclusive facts in the record to support the measures or refunds requested by the AG and CUB." Additionally, the Commission found that "[o]n the issue of storage manipulation, *** no definitive evidence was presented to show that this component of the GCPP was not operated as intended." The Commission noted that: (1) Nicor followed the withdrawal percentages in the order approving

the GCPP; (2) there was no evidence that Nicor should have been able to foresee the colder-than-normal weather and spike in gas prices in November and December 2001; and (3) in this type of analysis, it was necessary to look at the program as a whole, rather than at a limited period, as the latter might present an inaccurate picture of the entirety of the program. CUB filed a timely notice of appeal.

¶ 41                                                    ANALYSIS

¶ 42        CUB's first contention on appeal is that the Commission applied a much higher standard of proof than required under the Act, which rendered the Commission's decision arbitrary and unlawful. Specifically, CUB points to the language in the Commission's order that "no conclusive facts" and "no definitive evidence" supported CUB's request for damages related to improper storage withdrawals. CUB argues that these phrases indicate that the Commission applied a "clear and convincing" standard of proof. CUB contends that section 10-15 of the Illinois Administrative Procedure Act (5 ILCS 100/10-15 (West 2012)) defines the standard of proof to be applied to hearings under the Act. Specifically, section 10-15 provides that "[u]nless otherwise provided by law or stated in the agency's rules, the standard of proof in any contested case *** shall be the preponderance of the evidence." *Id.* CUB argues that the Act does not provide for any other standard of proof and, thus, the preponderance-of-the-evidence standard should have been applied, not a clear-and-convincing standard.

¶ 43        In response, the Commission and Nicor do not dispute that preponderance-of-the-evidence was the proper standard to be applied. The Commission does, however, contend that CUB forfeited this argument because the issue was not raised in CUB's application for rehearing before the Commission.

¶ 44        Pursuant to section 200.880(a) of the rules of the Illinois Commerce Commission (83 Ill. Adm. Code 200.880(a) (2000)), a party may file an application for rehearing from any order on the merits made by the Commission. The Commission's rules further provide that an appeal may not be taken unless an application for rehearing was filed and disposed of by the Commission. 83 Ill. Adm. Code 200.880(d) (2000). The Act expressly limits the scope of a party's appeal to those issues raised in the application for rehearing before the Commission. 220 ILCS 5/10-113(a) (West 2012) ("No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission."); *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 46 (appellate review of an issue is forfeited if a party fails to strictly comply with section 10-113(a) of the Act). The allegations in an application for rehearing must be stated in unequivocal terms and be sufficiently specific to apprise the Commission and the opposing parties of the actual points relied upon. *City of Granite City v. Illinois Commerce Comm'n*, 407 Ill. 245, 250 (1950). The purpose of the application is to point out mistakes of fact or law so that the Commission will have an opportunity to correct any errors and, perhaps, avoid the need for judicial review. *Meinhardt Cartage Co. v. Illinois Commerce Comm'n*, 15 Ill. 2d 546, 550-51 (1959).

¶ 45        In the present case, CUB argues that it did raise the issue of the improper standard of proof in its application for rehearing. CUB points out that in the application it noted that preponderance-of-the-evidence was the proper standard of proof and further argued that, "[b]y concluding that substantial evidence in the record supports the issue in the Settlement, but simultaneously concluding that there is not sufficient evidence to support CUB's and the AG's 2001 storage manipulation claims, the Commission is acting arbitrarily and capriciously."

CUB argues that the foregoing challenged the standard of proof applied by the Commission and put the Commission on notice of such a claim. We disagree. A general allegation about the proper standard of proof and a general allegation that the Commission was acting arbitrarily and capriciously were not sufficient to put the Commission on notice of the contention now raised on appeal–that it had applied an improper standard of proof in making its determination. *Granite City*, 407 Ill. at 250 (general allegation was not sufficient to preserve an issue for appeal); *City of Champaign v. Illinois Commerce Comm'n*, 141 Ill. App. 3d 457, 459 (1986) (issue forfeited for review where it was not properly raised "in unequivocal terms" in application for rehearing before the Commission). In failing to raise the present issue in unequivocal terms in the application for rehearing, CUB foreclosed the Commission's opportunity to either modify the language in its order or otherwise reconsider its determination in light of such a claim. Accordingly, CUB has forfeited this issue for purposes of review. *People ex rel. Madigan*, 2015 IL 116005, ¶ 46.

¶ 46    CUB's second contention on appeal is that the Commission's determination, that Nicor had not improperly manipulated storage withdrawals, was not supported by substantial evidence. "Because the Commission is an administrative agency, we will reverse its orders only if[:] the Commission's findings are not supported by substantial evidence based on the record; the Commission acted outside the scope of its statutory authority; the Commission issued findings in violation of the State or Federal Constitution or law; or the proceedings or the manner in which the Commission reached its findings violate[d] the State or Federal Constitution or laws, to the prejudice of the appellant." *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 120-21 (1995) (citing 220 ILCS 5/10-201(e)(iv)(A) to (e)(iv)(D) (West 1992)). In this case, CUB argues only that the Commission's order was not supported by substantial evidence. Substantial evidence is evidence that one would generally accept as sufficient to support a particular conclusion. *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997). Such evidence is more than a mere scintilla but may be less than a preponderance of the evidence. *Id.*

¶ 47    On appeal from an order of the Commission, the appellant bears the burden of proving that it was not supported by substantial evidence. 220 ILCS 5/10-201(d), (e)(iv) (West 2012). Merely showing that the evidence presented may support a different conclusion is not sufficient; rather, the appellant must show that the opposite conclusion is clearly evident. *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994). A reviewing court will not reevaluate the credibility or weight of the evidence or substitute its judgment for that of the Commission unless the Commission's judgment was clearly against the manifest weight of the evidence. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 70.

¶ 48    In the present case, we cannot say that the Commission's decision was not supported by substantial evidence. Moes and Gulick opined that Nicor's 2000-01 storage withdrawal activity was necessitated by weather and market conditions. They testified that Nicor's 2001 storage withdrawals and inventories were consistent with patterns nationwide, indicating that the withdrawal activity was not influenced by considerations related to the GCPP. They also testified that it would have been unreasonable to have increased the storage withdrawals in 2001 as suggested by Mierzwa, because it would have been inconsistent with Nicor's operating practices and could have impacted Nicor's ability to meet customer demand. Moes and Gulick opined that access to low-cost LIFO gas was accomplished through storage prefills

and was not related to withdrawal activity. Further, they noted that Nicor's customers paid competitive rates while the GCPP was in place, which demonstrated that Nicor was not manipulating storage withdrawals to the detriment of its customers.

¶ 49    Further, Carpenter testified that Mierzwa's evaluation as to 2001 storage withdrawals was based on hindsight rather than the market conditions known or anticipated when the actions were taken. Carpenter testified that market conditions had changed significantly in 2001 and that therefore it was inappropriate to compare 2001 to historical standards. For example, there was a highly unusual and unprecedented gas price spike in January 2001 and such gas price fluctuations had not occurred during the years that were the basis for CUB's 2001 storage withdrawal damages calculations. In addition, due to extreme cold temperatures in November and December 2000, Nicor withdrew more gas from storage during those months than it had historically. The resultant low inventory level in January 2001 restricted Nicor's ability to withdraw stored gas at the same levels it had in the past. Carpenter cited an EIA report, which stated that the cold temperatures in the final two months of 2000 resulted in soaring prices and a rapid drawdown of storage inventory.

¶ 50    Carpenter further testified that total storage inventory levels at the end of October 2000 were consistent with historical inventories and, therefore, there was no support for the assertion that Nicor started the winter withdrawal season with an unreasonably low level of inventory so as to position itself to access low-cost LIFO gas. Carpenter noted that Nicor's withdrawal activity in 2001 mirrored nationwide trends, which showed that Nicor had acted properly. Finally, Carpenter testified that, as stated in the Lassar report, an accounting method referred to as storage prefills was Nicor's strategy to access LIFO gas. As such, the testimony of Moes, Gulick, and Carpenter provided substantial evidence to support the Commission's determination.

¶ 51    CUB argues that in November 2000 Nicor increased storage withdrawals well beyond what was necessary and, during 2001, lowered the storage cycle under planned levels. CUB argues that these actions were taken to manipulate the benchmark and insulate Nicor against loss. While Mierzwa's testimony supported this proposition, the testimony of Carpenter, Moes, and Gulick supported a determination to the contrary. All three testified that the withdrawals in late 2000 and early 2001 were necessitated by the weather and market conditions and were not intended to manipulate the benchmark. It is well settled that the credibility of expert witnesses and the weight to be given their testimony are matters for the Commission as the finder of fact. *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 70.

¶ 52    CUB further argues that the Commission ignored the fact that, as compared to January 2001, Nicor withdrew more gas from storage in January 2003, even though the storage inventory was lower at the end of December 2002 as compared to December 2000. However, Carpenter criticized CUB's position for failing to consider the conditions known to Nicor when it made its withdrawal decisions in 2000 and 2001. Carpenter further testified that this type of comparison was inappropriate. Carpenter testified that, while total net withdrawals in January through April 2001 and 2003 were 30.3 Bcf and 35.9 Bcf, respectively, Mierzwa's 2001 damages calculation assumed that withdrawals should have been 73.8 Bcf in January through April 2001–more than double the withdrawals in Mierzwa's reference year of 2003. Moes and Gulick opined that Mierzwa's suggested 2001 withdrawals would have driven inventories to extremely low levels, would have been inconsistent with Nicor's operating

practices, and would have caused risk to both safety and reliability. Carpenter opined that market conditions had changed significantly in 2001 and that it was inappropriate to impose a historical standard retroactively. We cannot say that it was improper for the Commission to credit the testimony of Nicor's witnesses on this issue over that of Mierzwa. *Id.*

¶ 53    CUB next argues that the Commission ignored evidence that Nicor significantly reduced contract storage purchases to access additional LIFO layers. At the end of October 2000, contract storage inventory stood at 14.3 Bcf, which was 17.5 Bcf below the historical average of 31.8 Bcf. At the end of December 2000, Nicor's contract storage inventory was 5.9 Bcf, or 20.2 Bcf below the historical average inventory level of 26.1 Bcf. Mierzwa testified that, because Nicor failed to fill contract storage in the summer of 2000, inventory levels were depleted and customers were adversely affected. However, though Carpenter acknowledged that he did not know why the contract storage levels were what they were, he testified that contract storage levels did not matter, because Nicor's total inventory was still in line with historical averages. He opined that there were reasonable market-based justifications for Nicor's 2000 and 2001 storage activity. Moreover, Nicor's witnesses testified that Nicor did not have to manipulate storage withdrawals to take advantage of the low-cost LIFO inventory.

¶ 54    CUB also argues that Nicor's provision of "Hub services" reduced storage inventory available for ratepayers. This assertion was supported by Mierzwa's testimony that during the summer of 2000 Nicor accepted into storage 13.7 Bcf of gas from third parties and withdrew and returned that gas to the third parties by February 2001. Mierzwa also testified that, during February and March 2001, Nicor loaned eight Bcf of gas to third parties. CUB's position is that this gas could have been used to serve customers. However, Moes and Gulick did not agree with this assessment and testified that the park and loan transactions did not affect the price of gas for customers. Moes and Gulick explained that, although Nicor might have had custody of third-party gas, it did not own that gas and would have had to pay market prices had it delivered that gas to customers. Moreover, Nicor's experts agreed that Nicor's storage withdrawal activity was reasonable given the weather and market conditions at the time. Again, we cannot say that it was improper for the Commission to credit the testimony of Nicor's witnesses on this issue over that of Mierzwa. *Id.*

¶ 55    Finally, CUB challenges the Commission's decision to look at the GCPP program as a whole (2000 through 2002), and not just at a limited period (2001). Specifically, in denying CUB's claim related to improper storage withdrawals, the Commission stated that it was "necessary to look at the program as a whole and not just [at] a limited period that may present an unrealistic picture of the entirety of the program." CUB asserts that it was seeking an adjustment only for 2001 because that was the only year during which Nicor inappropriately suppressed storage withdrawals. Nonetheless, the Commission's statement that it was looking at the entirety of the GCPP program is no basis on which to reverse the Commission's decision. *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 397 (1998) ("the Commission is entitled to great deference because it is an administrative body possessing expertise in the field of public utilities"); *State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.*, 291 Ill. 209, 216 (1919) ("[a]ll doubts as to the propriety of means or methods used in the exercise of a power clearly conferred should be resolved in favor of the action of the commissioners in the interest of the administration of the law"). The parties agreed that the scope of the proceedings below would encompass all issues relating to any refunds that might be owing to Nicor customers during the years 1999 through

2002. In addition, the evidence provided by both parties acknowledged that 2001 inventory withdrawals were affected by actions taken and inventory levels in 2000. Moreover, regardless of the Commission's review of the program overall, there was substantial evidence to support its finding that there was no improper storage manipulation in 2001.

¶ 56                                              CONCLUSION

¶ 57            For the reasons stated, the order of the Illinois Commerce Commission is affirmed.

¶ 58            Affirmed.