Opinion filed December 14, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| LIFEENERGY, LLC, | ) | On Petition for Administrative Review |
| | ) | from The Illinois Commerce Commission. |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ICC Docket No. 18-1540 |
| | ) | |
| THE ILLINOIS COMMERCE COMMISSION | ) | |
| and THE CITIZENS UTILITY BOARD, | ) | |
| | ) | |
| Respondents. | ) | |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Birkett and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1     The Illinois Commerce Commission (Commission) assessed a $1 million penalty against

LifeEnergy, LLC (LifeEnergy), for violating multiple regulations relating to sales practices.

LifeEnergy appeals. For the reasons that follow, we affirm the penalty but vacate certain other

provisions in the Commission's order.

¶ 2                                I. BACKGROUND

¶ 3     In August 2016, the Commission issued LifeEnergy a certificate to operate as an alternative

retail electric supplier (ARES). An ARES is an "entity that offers for sale or lease, or delivers or

furnishes, electric power or energy to retail customers." (Emphases omitted.) 83 Ill. Adm. Code

412.10 (2017). In October 2017, the Commission made numerous changes to part 412 of Title 83

of the Illinois Administrative Code (Code) that affected each ARES. One of the new regulations required that, on or before May 1, 2018, all agents marketing or selling electricity for an ARES were required to complete a training program; each ARES also had to certify by that date to the Commission that its agents completed that program. 83 Ill. Adm. Code 412.170(e) (2017); see also 83 Ill. Adm. Code 412.15 (2017) (regulations must be implemented by ARES "on the first day of the month following 6 months from the date of the Commission's final order").

¶ 4    LifeEnergy failed to file the training certification required by section 412.170(e) before the May 1, 2018, deadline. On May 25, 2018, the Commission's staff requested information from LifeEnergy pertaining to its "possible underperformance in the Illinois retail electric choice market." On June 15, 2018, the Commission's staff sent LifeEnergy a notice of apparent violation (NOAV). In the NOAV, the Commission's staff explained that it received information that at least three of LifeEnergy's agents had been marketing and/or selling electricity in Illinois since May 1, 2018, even though LifeEnergy had not yet certified its agents' training.

¶ 5    On August 17, 2018, the Commission's staff prepared a report recommending that the Commission enter an initiating order to investigate LifeEnergy for violating part 412 of Title 83 of the Code. See 220 ILCS 5/10-101 (West 2018) (authorizing the Commission "to hold investigations, inquiries and hearings concerning any matters covered by" the Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2018)). In this report, the Commission's staff explained why it believed that LifeEnergy had violated the agent training and certification requirements of section 412.170(e).

¶ 6    On September 24, 2018, the Commission entered an order initiating proceedings against LifeEnergy to investigate and determine whether it complied with part 412 of Title 83 of the Code. Like the staff report, the Commission's initiating order detailed LifeEnergy's violations of the

agent training and certification requirements of section 412.170(e). An administrative law judge (ALJ) allowed the Citizens Utility Board (CUB) to intervene in the proceedings.

¶ 7 On September 25, 2019, the matter proceeded to a "paper hearing" before an ALJ pursuant to section 200.525 of Title 83 of the Code (83 Ill. Adm. Code 200.525 (1996)). The parties entered into evidence the transcripts of pre-prepared witness testimony, along with exhibits, without any cross-examination. The following is a summary of that testimony.

¶ 8                                        A. Testimony of Jim Agnew

¶ 9 Jim Agnew worked as the director of the Commission's consumer services division (CSD). He testified that this proceeding was "initiated specifically for, but not limited to, investigating whether LifeEnergy had complied with the training and certification requirements of Part 412" of Title 83 of the Code. Agnew explained that the impetus for the 2017 amendments to part 412 was "persistent consumer complaints received by CSD involving either confusion or alleged deception about the offers and/or the nature of the transactions." Two "key elements" of the amendments were the requirements in section 412.170(e) for each ARES to "ensure that [its] sales agents are fully knowledgeable" about the regulations and to certify its agents' training to the Commission. Agnew testified that "both of these must happen before an ARES allows an agent to solicit Illinois consumers on its behalf." The "two broad purposes" of the certification requirement were (1) to demonstrate "an ARES' continuing compliance with its managerial duty to oversee that the actions of sales agents fully comply with the Commission's rules" and (2) to "allow the Commission and its Staff to more efficiently ensure that agent training and oversight is occurring, along with taking action when deficiencies are noted."

¶ 10 Agnew testified that LifeEnergy was on notice of the new training requirements. The process of amending the regulations lasted from 2015 until October 19, 2017, when the

Commission issued its final order adopting the amendments. The Commission sent a copy of that final order the same day it was entered to the designated agents for every ARES, including LifeEnergy. Although the effective date of the amended part 412 was November 1, 2017, an ARES had until May 1, 2018, "to implement the changes and come into compliance with the amended rule." Between October 31, 2017, and June 11, 2018, the Commission's staff held workshops and sent e-mails to interested parties, including LifeEnergy, "to answer questions and discuss compliance strategies." Meanwhile, the Commission's information technology department designed an electronic filing system for each ARES to make its required filings. The Commission's staff sent notice to LifeEnergy once that system was completed on April 19, 2018.

¶ 11    Agnew testified that, on May 10 and 18, 2018, LifeEnergy submitted the filings required by some sections of the new part 412, but not the certification required by section 412.170(e). By the middle of June 2018, the Commission's staff received three informal consumer complaints about LifeEnergy that indicated that LifeEnergy might have enrolled customers after May 1, 2018. LifeEnergy's responses to those informal complaints later showed that its agents were actively soliciting customers without LifeEnergy having filed the certification required by section 412.170(e). Accordingly, on June 15, 2018, the Commission's staff sent a NOAV to LifeEnergy.

¶ 12    Agnew explained that LifeEnergy made a series of filings pursuant to section 412.170(e), starting on June 21, 2018. These filings showed that "a number of the agents" who were selling on LifeEnergy's behalf after May 1, 2018, had not been trained on the amended regulations. Specifically, LifeEnergy's June 21, 2018, filing showed that some of its agents did not complete their training until June 20, 2018. Between May 1 and June 20, 2018, LifeEnergy's "untrained agents" enrolled 1386 customers. Per Agnew's understanding of the regulation, each

day that LifeEnergy allowed its agents to enroll Illinois consumers before certifying the agents' training "represent[ed] a violation" of section 412.170(e).

¶ 13    Agnew testified that LifeEnergy made a second section 412.170(e) filing on June 26, 2018, which certified that additional agents were trained on June 18, 20, and 22, 2018. Those agents enrolled 78 customers during a 55-day period of noncompliance with section 412.170(e).

¶ 14    Agnew testified that LifeEnergy made its last section 412.170(e) filing on July 2, 2018. This filing showed that 11 additional agents completed their training on June 28, 2018. Those agents enrolled six customers during the period in question, all on June 28, 2018. Agnew did not know what time in the day the enrollments occurred versus the training, so he could not say whether these agents enrolled customers before or after being trained. Nevertheless, Agnew believed that LifeEnergy violated section 412.170(e) in connection with these enrollments, because LifeEnergy allowed agents to enroll customers before it certified the agents' training. Agnew deemed LifeEnergy's violations of section 412.170(e) "gravely concerning" because "untrained agents soliciting to and enrolling customers may be unable to ensure that the customers are fully and accurately informed on the material content of a prospective offer in a solicitation and understand the nature of the transaction."

¶ 15    According to Agnew, while investigating LifeEnergy's compliance with section 412.170(e), the Commission's staff discovered additional violations of part 412. For example, Agnew determined that LifeEnergy violated section 412.210 of Title 83 of the Code (83 Ill. Adm. Code 412.210 (2017)) by failing "to complete customer requests to rescind pending enrollments." To that end, Agnew noted seven instances where LifeEnergy did not timely process customers' requests to rescind their enrollments. Agnew believed that a customer's right to rescind an enrollment without penalty within 10 days was a "critical consumer protection."

¶ 16　Agnew further determined that LifeEnergy violated section 412.120(g) of Title 83 of the Code (83 Ill. Adm. Code 412.120(g) (2017)). That provision states that "[i]n-person solicitations that lead to an enrollment require a Letter of Agency or a third-party verification." 83 Ill. Adm. Code 412.120(g) (2017). If an agent uses a third party to verify an enrollment, the agent "shall not approach the customer after the TPV [(third-party verification)] for a period of 24 hours unless contacted by the customer." 83 Ill. Adm. Code 412.120(g) (2017). Agnew believed that LifeEnergy violated both the third-party-verification requirement of this section and the reapproach rule. With respect to the third-party-verification requirement, Agnew determined that LifeEnergy "allow[ed] in-person solicitation enrollments to occur without proper verification." Agnew identified five customer enrollments that violated section 412.120(g) because such enrollments "were not appropriately verified as required by the rule."

¶ 17　With respect to the reapproach rule, Agnew determined that LifeEnergy "allow[ed] and encourage[ed] by written procedure that in-person sales agents immediately re-approach a customer after a failed TPV." Agnew testified that LifeEnergy's agents improperly attempted multiple third-party verifications with the same customers in a 24-hour period on 20 occasions, 15 of which resulted in sales. On one occasion, an agent of LifeEnergy initiated a second third-party verification just 12 minutes after the first one resulted in a "no sale."

¶ 18　According to Agnew, LifeEnergy "appears to have instituted a practice for all in-person sales agents that by its design contravenes" the reapproach rule. Agnew believed that this was a "managerially sanctioned practice" that "calls into question the validity of the in-person sales enrollments made by Life Energy." Agnew drew his conclusion on this point based on the following written response that LifeEnergy provided when questioned by the Commission's staff

as to why some customers' names appeared multiple times on a spreadsheet detailing customer enrollments:

> "If the sale was classified as a 'No Sale', [*sic*] the sales agent is notified of the failed TPV in real time via their enrollment tablet, and depending on the No Sale disposition reason, will attempt to revisit and re-educate the customer allowing them to attempt the TPV process again. As a result, the customer's name *** is listed more than once, with ultimately one 'good sale' disposition identified under column 'status_txt.' "

Agnew testified that LifeEnergy violated the reapproach rule of section 412.120(g) over a 146-day period.

¶ 19    Agnew further testified that he "found several items of concern within LifeEnergy's discovery responses." These concerns never directly resulted in sanctions against LifeEnergy, so it is unnecessary to relate the specifics here. We merely note that one of the concerns related to LifeEnergy's method of internally tracking consumer complaints.

¶ 20    Agnew testified that, despite receiving a NOAV in June 2018, LifeEnergy continued in-person solicitations and enrollments until October 1, 2018—one week after the Commission initiated these investigative proceedings. Although Agnew would have preferred that LifeEnergy immediately stop behavior that violated regulations, he saw it as a "positive development" that LifeEnergy ceased in-person marketing within a week of the Commission initiating proceedings.

¶ 21    Ultimately, Agnew recommended that the Commission impose "appropriate penalties" for LifeEnergy's violations of sections 412.170(e), 412.120(g), and 412.210 of Title 83 of the Code. Furthermore, he proposed that LifeEnergy be required to contact all customers that it enrolled between May 1 and October 1, 2018, to offer them the options of (1) canceling their contracts without penalty and (2) seeking refunds if they paid more for electricity than they would have had

they stayed with their previous suppliers. Finally, Agnew recommended that LifeEnergy be ordered to "cease all sales and marketing in Illinois" until it collaborated with the Commission's staff and the CUB to alter its procedures and marketing materials and thereafter demonstrated compliance.

¶ 22                                    B. Edwin Dearman's Testimony

¶ 23    Edwin Dearman, a former employee of LifeEnergy, testified on LifeEnergy's behalf. Dearman testified that, on October 1, 2018, LifeEnergy voluntarily suspended all residential sales of electricity in Illinois, pending the resolution of these proceedings. As of June 7, 2019, LifeEnergy had sold substantially all its customer contracts to a company called NRG Retail, Inc. (NRG).

¶ 24    Dearman testified that LifeEnergy hired him in April 2018 as its regulatory and compliance director. He managed a staff of two and reported directly to LifeEnergy's general counsel. He was charged with "immediately auditing all aspects of the company's regulatory compliance in each of the 6 states in which LifeEnergy served customers." That entailed, for example, "reviewing the complaint and quality control process, marketing collateral, and customer care and vendor training materials." Dearman explained that his regulatory team "focused intensely on bringing all aspects of billing, operations, and customer care into 100% compliance in each of the states in which LifeEnergy was operating as quickly as possible."

¶ 25    Dearman testified that "LifeEnergy acted in good faith to achieve timely compliance with the revised Part 412 training enhancements and certification requirements." He stated that, when he arrived at LifeEnergy in April 2018, he was aware of Illinois's May 1, 2018, compliance deadline. He thus created a checklist "to assist in project managing all departments with reaching compliance by the May 1st deadline or shortly thereafter." On May 10, 2018, Dearman created an

e-filing account with the Commission. On May 10 and May 18, 2018, he submitted filings to the Commission relating to regulations that are not at issue in these proceedings. LifeEnergy then trained its customer service representatives between May 18 and May 25, 2018. Dearman was further delayed in filing the required training certification, because he was revising LifeEnergy's training materials "per the Part 412 specifications." At some point in May 2018, he attempted to certify LifeEnergy's customer service representatives' training, but he was unable to do so due to a technological issue. Dearman claimed that he completed that certification "at a later date in May" with the assistance of the Commission's technology department. On June 21, 2018, LifeEnergy "successfully filed" the required certifications regarding "training for both LifeEnergy's customer service representatives and door-to-door sales agents."

¶ 26      According to Dearman, a "variety of factors" delayed his ability to make timely filings and complete the necessary tasks to comply with the revised regulations. He acknowledged that he "simply was overwhelmed by the amount of work" that he was asked to complete in his first full month of employment with LifeEnergy, upon his predecessor's "abrupt departure." This work included, for example, conducting an audit of regulatory reporting and compliance, implementing improvements to complaint response procedures, retraining staff, and reviewing marketing campaigns. Dearman said that he understood that it was a priority to achieve compliance with part 412, and he insisted that he "did not intentionally seek to delay or refuse to attempt compliance."

¶ 27      Addressing the gravity of LifeEnergy's regulatory violations, Dearman emphasized that the period of noncompliance with section 412.170(e) was only 55 days. Additionally, LifeEnergy ended up billing only 936 of the customers who were enrolled during that period. LifeEnergy was willing to refund those customers the difference between what they paid LifeEnergy and what they would have paid for electricity absent their contracts with LifeEnergy. Dearman calculated that

amount to be "approximately $34,000." LifeEnergy was also willing to allow the 223 remaining customers that it had as of July 8, 2019, to cancel their contracts without incurring an early-termination penalty.

¶ 28    Dearman testified that, in his experience, when regulators implement new rules, there is an "initial grace period" or a "shake-out period," during which the regulators and the suppliers collaborate to achieve "best in class" practices. In this period, regulators typically do not immediately impose penalties for noncompliance or open enforcement proceedings. Instead, in Dearman's view, "[f]airness dictates appropriate notice and warnings before imposing penalties (beyond a requirement to reimburse customers for any losses they might have experienced as a result of non-compliance)."

¶ 29    Dearman testified that he never received a warning that LifeEnergy was out of compliance with regulations. Instead, on or about May 17, 2018, Jean Gibson, the director of the office of retail market development for the Commission, advised him that LifeEnergy would be receiving interrogatories. Gibson left Dearman with the impression that the interrogatories "were informational and should not be of concern to LifeEnergy." Dearman testified that he would have expected Gibson to warn him if the Commission's staff "considered the delayed filings to be a significant issue." Dearman explained that, had the Commission informed him that the delayed filings were a significant concern, he "could have dropped all of [his] other regulatory compliance projects and focused on that one project."

¶ 30    Moreover, Dearman did not expect that delayed filings in and of themselves would "raise serious concerns." On this point, Dearman mentioned that "LifeEnergy had always made timely filings in the past" and, to his knowledge, "had never received a formal or informal complaint" from the Commission's staff about noncompliance with rules. In his experience, if a report is filed

late, the regulator will contact the company to request the filings as soon as possible. According to Dearman, "[t]he typical goal is compliance, not punishment." Only when a company repeatedly files reports late, ignores the regulator's request, or has a history of past violations will the regulator issue a NOAV "without further discussion." Dearman believed that none of those circumstances existed here. Nor did LifeEnergy intentionally or repeatedly ignore rules or act with reckless disregard for compliance to warrant enforcement hearings and penalties.

¶ 31    Furthermore, according to Dearman, after the May 1, 2018, certification deadline, the Commission's staff was "still investigating what constituted 'best in class' in terms of training materials and programs." This included the Commission's staff holding a workshop on June 12, 2018, which Dearman attended and found beneficial as he was revising LifeEnergy's training materials. Accordingly, Dearman was surprised when, three days later, LifeEnergy received a NOAV related to agent training.

¶ 32    Dearman believed that "the rule implementation was a work in progress and that getting it right was more important than completing the filings by May 1, 2018." Although Dearman acknowledged that "LifeEnergy received all of the notices of the rule adoptions and workshops" before he started working there, in his experience, "the pre-implementation process only provides limited insights as to what ultimately the state commission and its staff will deem sufficient training materials." Thus, "[c]ompliance really begins when the retail energy providers begin producing the training materials post-implementation for commission staff's review and informal approval." As an example of this, Dearman noted that Agnew identified in his testimony some issues about LifeEnergy's processes and training materials that were concerning but not directly violative of the regulations.

¶ 33   Dearman testified that Agnew made an unfair characterization in his testimony by saying that LifeEnergy acquired customers using "untrained agents." To support his conclusion, Dearman testified that LifeEnergy had trained its sales agents on the regulations that existed before May 1, 2018, and the revised regulations merely "added to the base training requirements" that were already in place.

¶ 34   Dearman agreed with Agnew that LifeEnergy should refund customers the difference between what they paid LifeEnergy and what they would have paid their previous providers for electricity. Dearman proposed that the refunds should be limited to the 55-day period of noncompliance rather than extended to October 1, 2018. Dearman also indicated that LifeEnergy did not object to Agnew's recommendations regarding certain "behavioral requirements" for LifeEnergy moving forward. But Dearman asserted that additional financial penalties were unwarranted, given that "the rule violations lasted for a relatively short duration, had limited impact on a small group of customers, and were not made intentionally or with complete disregard for the importance of timely compliance."

¶ 35                    C. Agnew's Rebuttal Testimony

¶ 36   After reviewing Dearman's testimony, Agnew had "more concerns about LifeEnergy's operations in Illinois" than before. One concern was that, contrary to what Dearman testified, the Commission's staff "has had previous discussions with LifeEnergy regarding compliance concerns stemming from complaints in 2017." Specifically, the Commission's staff communicated with LifeEnergy's representatives and discussed concerns about LifeEnergy's marketing practices, sales scripts, and misinformation to consumers about the amount of the early-termination fee. In response to the Commission's staff's concerns, LifeEnergy altered its marketing method, rewrote its sales scripts, and sent information to customers about the accurate early-termination fee.

Subsequently, the Commission's staff "continued to work with LifeEnergy to address the informal complaints it was receiving." The volume of such complaints "placed LifeEnergy among the poorest performers." Thus, although Agnew acknowledged that Dearman may not have known all this information, Dearman's testimony did not support LifeEnergy's grievances about the fairness of the Commission initiating proceedings based on violations of new regulations.

¶ 37 Another one of Agnew's concerns was that Dearman's testimony "strongly conveys that LifeEnergy's compliance with Commission rules and regulations rested exclusively with one person." According to Agnew, the fact that LifeEnergy gave Dearman such responsibility without informing him of the company's previous issues with the Commission was a "clear failure of [LifeEnergy] to properly manage its operations in Illinois." Moreover, LifeEnergy should have been aware of its obligation to comply with the amended regulations by May 1, 2018. Agnew asserted that Dearman, too, was aware of the amendments by virtue of his work for a different company prior to his employment with LifeEnergy.

¶ 38 Agnew further testified that Dearman incorrectly asserted that LifeEnergy's compliance failures were minor. Agnew noted that Dearman failed to address LifeEnergy's alleged violations of sections 412.120(g) and 412.210, which the Commission's staff deemed to be "extremely serious" violations. The full extent of LifeEnergy's violations of section 412.120(g) was unknown, however, because LifeEnergy "inexplicably stopped tracking direct complaints it received from consumers on June 15, 2018," in contravention of section 410.40 of Title 83 of the Code (83 Ill. Adm. Code 410.40 (2004)).

¶ 39 Agnew also disagreed with Dearman's claim that LifeEnergy's violations affected only a small number of customers. According to Agnew:

"An improperly managed sales team going door-to-door, equipped with confusing marketing materials, untrained on the amended Part 412, and directed by LifeEnergy to return to consumers' houses immediately after a failed TPV in violation of Part 412.120(g) impacts not only every consumer enrolled, but also every consumer with whom they come in contact. The 'gravity' of this impact is also felt by LifeEnergy's peers in the retail market that had structured their sales campaigns to be fully compliant. In addition to enjoying the unfair competitive advantage of acquiring customers in violation of the amended Part 412, LifeEnergy's practices negatively impact the public's overall perception of the retail energy market."

¶ 40    Responding to Dearman's testimony that LifeEnergy had no warning of the Commission's staff's concerns about noncompliance, Agnew pointed to "three concrete instances which put LifeEnergy on notice that Staff had serious concerns regarding its marketing practices prior to the initiation of this docket." First, on May 25, 2018, the Commission sent LifeEnergy interrogatories for the stated purpose of investigating LifeEnergy's "possible underperformance in the Illinois retail electric choice market." According to Agnew, one purpose of those interrogatories was to put companies like LifeEnergy "on notice that Staff was watching them as the amended Part 412 rule was taking effect." Second, on June 15, 2018, the Commission's staff sent LifeEnergy a NOAV. Third, on July 11, 2018, the Commission's staff recommended denying LifeEnergy's unrelated application for a certificate to operate as an alternative gas supplier, due to LifeEnergy's "poor performance record" as an ARES.

¶ 41    Agnew also noted that Dearman's testimony contained factual inaccuracies. Although Dearman testified that he began working for LifeEnergy in April 2018, Dearman made certain filings with the Commission on behalf of LifeEnergy as early as March 9, 2018. Additionally,

although Dearman portrayed himself as being "singularly focused upon compliance with Part 412" when he started working for LifeEnergy, Dearman sent the Commission's staff an e-mail on April 2, 2018, pertaining to matters that were unrelated to regulatory compliance. Addressing Dearman's testimony regarding his conversation with Gibson preceding the May 2018 interrogatories, Agnew deemed it "highly unlikely that Ms. Gibson would contradict the goal" of the interrogatories in her communications with Dearman.

¶ 42     Agnew also believed that Dearman downplayed the importance of the agent training and certification requirements. Contrary to what Dearman asserted, there was no "grace period" for compliance, apart from the six months between November 1, 2017, and April 30, 2018. Full compliance with the amended part 412 was required on May 1, 2018, "and at no time did Staff convey anything different to ARES[es]." The workshop that the Commission's staff held in June 2018 to discuss best practices in training was "meant to facilitate the flow of different ideas on the subject, not [to] create a set of standards for Staff to impose on all ARES[es]." In Agnew's view, LifeEnergy should have chosen to suspend marketing to Illinois consumers on May 1, 2018, and not resumed until it was fully compliant.

¶ 43     Agnew testified that his recommendations to the Commission changed as a result of Dearman's testimony. If LifeEnergy planned to resume operating in Illinois as an ARES, Agnew believed that all the recommendations that he outlined in his direct testimony were appropriate. If, however, LifeEnergy planned to withdraw permanently from the Illinois market, it should be required to refund affected customers, pay penalties imposed by the Commission, and surrender its certificate as an ARES.

¶ 44                    D. LifeEnergy's Surrender of Its Certificate

¶ 45    In September 2019, after the witnesses had prepared their testimony but before the parties submitted the transcripts of that testimony to the ALJ, LifeEnergy notified the Commission that it intended to surrender its certificate authorizing it to operate as an ARES. LifeEnergy indicated that it sold its assets to NRG on June 7, 2019, at which time it ceased marketing to new Illinois consumers.

¶ 46                              E. The Parties' Arguments

¶ 47    The Commission's staff argued that LifeEnergy violated sections 412.170(e), 412.120(g), and 412.210 of Title 83 of the Code. The Commission's staff recommended that the Commission impose financial penalties on LifeEnergy. Section 16-115B(b)(2) of the Act authorizes the Commission to impose financial penalties "not to exceed (i) $10,000 per occurrence or (ii) $30,000 per day for those violations or non-conformances which continue after the Commission issues a cease and desist order." 220 ILCS 5/16-115B(b)(2) (West 2018). Relying on Agnew's testimony, the Commission's staff calculated a maximum penalty of $2.13 million under this statute, broken down as follows:

> 55 days of violating section 412.170(e) by failing to train agents and certify such training. Each day constituted an "occurrence," for a total of $550,000 ($10,000 x 55).

> 146 days of violating the reapproach rule of section 412.120(g) through a managerially sanctioned practice. Each day constituted an "occurrence," for a total of $1,460,000 ($10,000 x 146).

> 5 enrollments that violated the verification requirements of section 412.120(g). Each enrollment constituted an "occurrence," for a total of $50,000 ($10,000 x 5).

7 enrollments that violated section 412.210 because LifeEnergy failed to complete customers' requests to rescind sales contracts. Each enrollment constituted an "occurrence," for a total of $70,000 ($10,000 x 7).

The Commission's staff then considered two other portions of the Act as "guidance in recommending appropriate penalties": section 4-203(a) and 5-202 (220 ILCS 5/4-203(a), 5-202 (West 2018)). According to the Commission's staff, pursuant to section 4-203(a) of the Act, when assessing a penalty, the Commission should consider LifeEnergy's size as a business, the gravity of the violations, other mitigating or aggravating factors, and whether LifeEnergy acted in good faith to achieve compliance after notification of a violation. See 220 ILCS 5/4-203(a) (West 2018). Additionally, the Commission's staff noted that section 5-202 of the Act established that, in circumstances involving continuing violations of a regulation, the cumulative penalty for such violations cannot exceed $500,000. See 220 ILCS 5/5-202 (West 2018). The Commission's staff believed that LifeEnergy's violation of section 412.170(e) of Title 83 of the Code was an ongoing violation, as was LifeEnergy's violation of section 412.120(g) based on its policy of reapproaching customers. Thus, the Commission's staff argued, LifeEnergy should not be fined more than $500,000 for either of those violations. After examining various mitigating and aggravating factors, the Commission's staff ultimately recommended penalties against LifeEnergy of between $350,000 and $1 million.

¶ 48    The CUB largely echoed the positions articulated by the Commission's staff. However, instead of recommending a penalty range, the CUB urged the Commission to "impose the full penalty of $10,000 per occurrence upon LifeEnergy."

¶ 49    LifeEnergy conceded that it violated the Commission's rules, but it denied that its agents' violations of the reapproach rule was managerially sanctioned behavior. LifeEnergy also disagreed

with some of Agnew's specific criticisms about its practices, such as its method of tracking customer complaints. Although LifeEnergy argued that the Commission's staff's methodology for calculating potential penalties lacked a basis in the evidence, LifeEnergy did not provide any alternative calculations. LifeEnergy maintained that, because it agreed to surrender its ARES certificate and refund its customers approximately $34,000, additional financial penalties in any amount were unwarranted.

¶ 50    In its initial brief, the Commission's staff did not contest LifeEnergy's calculation of customer refunds. In its reply brief, however, the Commission's staff asserted that potential "inadvertent errors" in LifeEnergy's documentation gave rise to concerns regarding the accuracy of LifeEnergy's calculations. Accordingly, the Commission's staff recommended that the Commission request clarification from LifeEnergy on these points and direct LifeEnergy to submit updated calculations. Specifically, in its position statement, the Commission's staff recommended that LifeEnergy be required to (1) "file the customer list and the proposed refunds for those customers identified"; (2) "specify in this filing how the customer was identified, the amount the customer will be refunded, how it was calculated, and the timeframe the customer was enrolled with LifeEnergy"; (3) refund customers within 90 days, assuming that the Commission and the CUB did not object to the calculations; and (4) "file proof of the distribution of refunds within this docket once completed."

¶ 51                    F. The ALJ's Proposed Order

¶ 52    On February 3, 2020, the ALJ submitted a proposed order to the Commission. She determined that LifeEnergy violated sections 412.170(e), 412.210, and 412.120(g) of Title 83 of the Code. Nevertheless, she recommended imposing no financial penalties, apart from LifeEnergy having to refund customers and surrender its ARES certificate.

¶ 53                                    G. The Commission's Order

¶ 54    On May 27, 2020, the Commission issued its order. The Commission found as follows.

¶ 55    The purpose of amending part 412 in 2017 was to strengthen rules and consumer protections. The Commission must ensure that customers receive accurate information about each ARES, and part 412 was "vital to the Commission's mission of ensuring this takes place and ultimately protecting Illinois consumers and the retail market." It was also "paramount" and "of the utmost importance" to ensure that ARES agents are trained and properly inform customers so that customers understand the terms of sales contracts.

¶ 56    The Commission recognized that LifeEnergy admitted to violating sections 412.170(e), 412.210, and 412.120(g) of Title 83 of the Code. Nevertheless, LifeEnergy's acknowledgement of responsibility and agreement to exit the Illinois retail energy market permanently did not make additional penalties unwarranted. To that end, it was concerning to the Commission that "LifeEnergy engaged in marketing to Illinois consumers while out of compliance with the rules, especially since LifeEnergy offers no reasonable basis or excuse for its conduct." The Commission also determined that LifeEnergy "not only harmed Illinois consumers and benefitted from the individuals enrolled using methods contrary to Illinois rules and regulation [*sic*], but also harmed the Illinois retail market." In a similar vein, the Commission reasoned that LifeEnergy's lack of compliance "not only affect[ed] its own customers but the entire electric supplier marketplace." In the Commission's view, companies "of any size" that do not comply with rules have a competitive advantage over other companies. According to the Commission, if an ARES fails to comply with rules, "the Act calls upon the Commission to apply a penalty to ensure that the market is adequately protected for both consumers" and other companies that operate lawfully.

¶ 57    Moreover, the Commission concluded that LifeEnergy employed "intentional, deceptive, and misleading behavior" in its marketing and sales practices. The Commission stated that "[s]uch practices harm LifeEnergy's competitors by giving [LifeEnergy] an unfair advantage in acquiring customers and also harm the public's perception of the retail energy market as a whole."

¶ 58    The Commission believed that its staff's calculation of penalties was "reasonable and supported by the record." The Commission's staff's recommendation regarding the range of penalties ($350,000 to $1 million) likewise was "appropriate, reasonable, based on the evidence in the record and warranted by the Act." The Commission agreed with its staff's consideration of the mitigating and aggravating circumstances presented. Nevertheless, contrary to what the Commission's staff suggested, the Commission asserted that the $500,000 cumulative limit for continuing violations outlined in section 5-202 of the Act did not apply.

¶ 59    The Commission explained that section 16-115B of the Act gave it discretion to interpret the word "occurrence." In this respect, the Commission determined that its staff's approach was "reasonable in calculating the penalty based upon each day of no-compliance [*sic*] or each enrollment as an individual occurrence." On this point, the Commission explained:

"With respect to violations of Sections 412.170(e) and 412.120(g), a day of non-compliance appears to capture the violation of the Act more effectively and true to the intent of the Act in terms of penalizing the prohibited behavior (*e.g.* marketing without proper training, or improper managerial practices), rather than the consequences of such prohibited behavior (enrolled customers). During such day, an untrained agent may market to multiple customers, and regardless of whether any particular customer is enrolled, the marketing and solicitation to a customer without proper training is a violation of itself [*sic*]. Similarly, improper managerial practices can have multiple consequences, that can

manifest in many different ways, whether on a day such practices persisted or later. Whether any specific result of such practice can be captured, a sanctioned managerial practice of disregarding the Act and Commission Rules is of itself a prohibited behavior that calls for penalties."

¶ 60    In considering the mitigating and aggravating circumstances, the Commission recognized that LifeEnergy was willing to refund customers and reasonably commenced training its agents within six days of receiving the NOAV. Nevertheless, the Commission was "not persuaded that such behavior was entirely a good faith effort to mitigate violations, rather than a business decision in the effort to make its assets more marketable and less exposed to liability in its sales negotiations with NRG." The Commission also was "not convinced by LifeEnergy's argument that it has taken responsibility for all of the alleged violations and acted in good faith by agreeing to refund customers and by surrendering its certificate."

¶ 61    The Commission concluded that, on top of reimbursing customers, a monetary penalty was "necessary" here. The Commission imposed a $1 million penalty, explaining its rationale as follows:

"Based on the evidence in the record, the appropriateness of the penalty to the size of the business and the gravity of violations, the Commission assesses a penalty of $1,000,000 (one million), on the highest end of the range suggested by Staff. The Commission finds such penalty justified, considering the harm caused to the Illinois consumers and the retail electric market as a whole. In determining the appropriateness of the penalty to the size of the business, the Commission takes into account not just the customers that LifeEnergy was able to enroll, but also all the customers that were marketed to in Illinois, as well as all other customers in Illinois that the Company could have marketed to under its

Certificate of Service Authority. This penalty is not to 'punish' or 'make an example of' LifeEnergy. The penalty enforces the Act and the Commission's Part 412 rules, which envision an efficient and fair operation of the retail market, protection of Illinois consumers and fair competition. No market can exist without a fair competition. When the General Assembly restructured the Illinois power industry, it entrusted the Commission with an important task of safeguarding Illinois customers against precisely the behaviors that gave rise to this docket. The Act calls upon the Commission to establish rules and enforce them in a way that ensures that customer protection and fair competition safeguards are in place. Thus, it is the duty of the Commission in this docket to make sure that these safeguards are functioning properly."

¶ 62    The Commission accepted LifeEnergy's representation that it would refund customers enrolled between May 1 and July 2, 2018, "in an amount which is equal to the difference between what the customers actually paid and the amount that they would have paid on default service." The Commission indicated in various places in the order that LifeEnergy "should" and "shall" refund its customers $34,178.20 (the amount calculated by LifeEnergy) within 45 days of the order and make a compliance filing within 30 days thereafter to prove that the refunds were distributed. Nevertheless, because the Commission's staff identified potential inaccuracies in LifeEnergy's calculations, the Commission imposed the following requirements in conjunction with the refund:

"LifeEnergy shall file within this docket both confidential and public redacted versions of the customer list and the proposed voluntary refunds for the identified customers within ten (10) days of the date of this Order. [LifeEnergy] shall specify in its filing how the customer was identified, the amount the customer is refunded, how the refund amount was

calculated, and the timeframe during which the customer was enrolled with LifeEnergy. Any party may file an objection identifying inaccuracies in [LifeEnergy's] calculations, if any, within thirty (30) days of the date of this Order. If any party files an objection, the Commission Staff shall file a recommendation on how to proceed with any such discrepancies within forty (40) days of the date of this Order."

¶ 63 Finally, the Commission ordered that LifeEnergy's certificate to operate as an ARES was "hereby cancelled," consistent with LifeEnergy's notice that it surrendered its certificate.

¶ 64 H. The Dissent

¶ 65 Two commissioners filed a "dissent" that would more accurately be characterized as a partial concurrence and partial dissent.

¶ 66 The dissenting commissioners believed that LifeEnergy should have been penalized separately for two distinct violations of section 412.170(e) of Title 83 of the Code: (1) failing to train agents and (2) failing to certify the agents' training. However, the dissenting commissioners believed that LifeEnergy did not violate sections 412.210 and 412.120(g), as LifeEnergy was not provided "due process and notice of such alleged violations" (this was an issue that the dissenting commissioners raised *sua sponte*). Furthermore, the dissenting commissioners believed that sections 4-203 and 5-202 of the Act were not applicable when assessing penalties pursuant to section 16-115B of the Act. Moreover, the dissenting commissioners argued that it would violate due process to apply sections 4-203 and 5-202 of the Act to LifeEnergy, as such sections were not mentioned in the NOAV, the staff report, or the initiating order.

¶ 67 The dissenting commissioners opined that LifeEnergy violated section 412.170(e) of Title 83 of the Code in two separate ways for 55 days. The dissenting commissioners determined that the evidence warranted the maximum penalty of $10,000 per occurrence, with each day

constituting an occurrence of two separate violations. Accordingly, the dissenting commissioners would have penalized LifeEnergy in the amount of $1.1 million ($10,000 x 55 x 2). In this respect, the dissenting commissioners agreed with the majority that LifeEnergy's conduct was serious and had "a significant negative impact upon the entire retail electric market."

¶ 68    Finally, the dissenting commissioners accepted LifeEnergy's calculation of customer refunds. Although the dissenting commissioners agreed to order LifeEnergy to submit proof to the Commission when it refunds customers, the dissenting commissioners questioned the Commission's authority to require LifeEnergy to submit its calculations for vetting and confirmation at this stage in the proceedings.

¶ 69                        I. Subsequent Proceedings and Appeal

¶ 70    On June 8, 2020, LifeEnergy filed an application for rehearing. On June 18, 2020, the Commission denied LifeEnergy's application. The Commission later granted LifeEnergy's motion to stay enforcement of the final order pending appeal. LifeEnergy timely appealed. By statute, the appeal proceeds directly to this court. 220 ILCS 5/10-201 (West 2018). The CUB did not file a brief in this court.

¶ 71                                II. ANALYSIS

¶ 72    On appeal, LifeEnergy argues that the Commission exceeded its jurisdiction by failing to provide adequate notice of some of the regulatory violations for which LifeEnergy was penalized and imposing a financial penalty greater than the maximum allowed by statute. LifeEnergy also argues that the $1 million penalty is arbitrary and capricious and that the Commission erroneously ordered postdecisional evidence and submissions.

¶ 73    According to section 10-201(d) of the Act:

"The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." 220 ILCS 5/10-201(d) (West 2018).

We may reverse an order entered by the Commission in four circumstances: (1) if the Commission's findings were "not supported by substantial evidence," (2) if the Commission acted without jurisdiction, (3) if the challenged order violated "the State or federal constitution or laws," or (4) if the proceedings violated "the State or federal constitution or laws, to the prejudice of the appellant." 220 ILCS 5/10-201(e)(iv) (West 2018).

¶ 74                                 A. Notice of Violations

¶ 75    LifeEnergy first argues that it lacked adequate notice of its purported violations of sections 412.120(g) and 412.210 of Title 83 of the Code, as such violations were not identified in the NOAV, the staff report, or the order initiating proceedings. According to LifeEnergy, this lack of notice violated statutory requirements (see 220 ILCS 5/10-101 (West 2018) and 5 ILCS 100/10-25(a)(3) (West 2018)) and procedural due process. The Commission responds, *inter alia*, that the invited-error doctrine prohibits LifeEnergy from prevailing on these arguments.

¶ 76    Invited error is a form of estoppel that bars a party from complaining on appeal about "error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). The rationale for the doctrine is that " ' "[i]t would be manifestly unfair to allow one party a second trial upon the basis of error which he injected into the proceedings." ' " *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) (quoting *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 543 (1984)). The doctrine is applied strictly, as "a party's 'active

participation in the direction of proceedings *** goes beyond mere waiver' such that the traditional exceptions to the waiver rule do not apply." *Swope*, 213 Ill. 2d at 218 (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). The invited-error doctrine can apply to a party's conduct before an administrative tribunal. See *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 61, *aff'd*, 2013 IL 114876.

¶ 77    We hold that LifeEnergy's arguments are barred by the invited-error doctrine. In its reply brief before the Commission, LifeEnergy acknowledged violating sections 412.120(g) and 412.210 of Title 83 of the Code but argued that no financial penalty was warranted under the circumstances ("[A]lthough Staff and CUB chastise LifeEnergy for allegedly refusing to take responsibility for violations of Section 412.120(g) and Section 412.210 ***, LifeEnergy has acknowledged those violations by agreeing to surrender its Certificate."). The ALJ found that LifeEnergy violated multiple regulations, including sections 412.120(g) and 412.210, but that such violations did not warrant a financial penalty. LifeEnergy urged the Commission to enter the ALJ's proposed order as drafted. The Commission nevertheless determined that the circumstances justified imposing a financial penalty. LifeEnergy thus invited the Commission to pass judgment on whether its violations of sections 412.120(g) and 412.210 warranted a financial penalty. Having done so, it would be manifestly unfair to allow LifeEnergy to complain on appeal that it lacked notice that it faced potential penalties for its violations of those sections. The invited-error doctrine applies.

¶ 78    Even if the invited-error doctrine did not apply, LifeEnergy's arguments would fail on the merits. With respect to LifeEnergy's constitutional analysis, "[p]rocedural due process does not require that the charges or complaint in an administrative proceeding be drawn with the same precision, refinements, or subtleties as pleadings in a judicial proceeding." *Siddiqui v. Department*

*of Professional Regulation*, 307 Ill. App. 3d 753, 759 (1999). Instead, "the charge need only reasonably advise the respondent as to the charges so that he or she will intelligently be able to prepare a defense." *Siddiqui*, 307 Ill. App. 3d at 759-60. To that end, "[d]ue process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand." *Siddiqui*, 307 Ill. App. 3d at 760.

¶ 79 Here, although the Commission's order initiating the proceedings focused on LifeEnergy's violations of section 412.170 of Title 83 of the Code, some language in the order suggested that the scope of the proceedings was much broader. Specifically, the Commission ordered "that a proceeding be initiated to investigate and determine whether LifeEnergy, LLC has complied with the requirements of 83 Ill. Adm. Code 412, Obligations of Retail Electric Suppliers, and, if LifeEnergy, LLC has not so complied, to impose an appropriate penalty for its noncompliance." We need not decide whether the initiating order was sufficient, in itself, to put LifeEnergy on notice that it was charged with violating sections 412.120(g) and 412.210 of Title 83 of the Code. That is because, "[i]n determining whether the respondent has adequate notice, the court may consider the discovery and other materials available to the respondent." *Siddiqui*, 307 Ill. App. 3d at 760.

¶ 80 Agnew provided his direct testimony on April 9, 2019. In his testimony, Agnew detailed LifeEnergy's violations of sections 412.170(e), 412.120(g), and 412.210, and he recommended that the Commission assess "appropriate penalties." LifeEnergy then had three months to prepare its direct evidence. The record gives rise to the inference that LifeEnergy strategically chose to defend against the Commission's staff's allegations by conceding the violations while emphasizing that the circumstances did not warrant a financial penalty. Although LifeEnergy argues on appeal that it did not have sufficient notice of its alleged violations of sections 412.120(g) and 412.210,

it made no such claim when it urged the Commission to adopt the ALJ's findings, which included findings that LifeEnergy violated these sections. Rather, LifeEnergy did not claim surprise until after the Commission found that a financial penalty was warranted and after the dissent raised the notice issue. Under these circumstances, LifeEnergy had sufficient notice of the charges to comply with due process.

¶ 81    In support of its argument that it was denied due process, LifeEnergy relies on *Quantum Pipeline Co. v. Illinois Commerce Comm'n*, 304 Ill. App. 3d 310 (1999). *Quantum Pipeline* is factually distinguishable, because it involved a situation where the Commission improperly revoked a company's certificate to operate when the Commission neither alleged nor found that (1) the company violated the previous final order granting the certificate or (2) the previous final order was erroneous. *Quantum Pipeline*, 304 Ill. App. 3d at 320.

¶ 82    LifeEnergy's statutory-notice argument fails for similar reasons. The Commission initiated investigative proceedings against LifeEnergy pursuant to section 10-101 of the Act (220 ILCS 5/10-101 (West 2018)). That statute incorporates by reference section 10-25 of the Illinois Administrative Procedure Act (5 ILCS 100/10-25 (West 2018)). In turn, section 10-25(a)(3) of the Illinois Administrative Procedure Act provides that notice to a respondent must include "[a] reference to the particular Sections of the substantive and procedural statutes and rules involved." 5 ILCS 100/10-25(a)(3) (West 2018). Here, the Commission's initiating order did not specifically mention violations of sections 412.120(g) and 412.210 of Title 83 of the Code.

¶ 83    However, not every failure to comply with section 10-25(a)(3) of the Illinois Administrative Procedure Act voids the judgment or commands reversal. To the contrary, section 10-101 of the Act states that "[n]o violation of this Section or the Illinois Administrative Procedure Act and no informality in any proceeding or in the manner of taking testimony before the

Commission *** shall invalidate any order, decision, rule or regulation made, approved, or confirmed by the Commission in the absence of prejudice." 220 ILCS 5/10-101 (West 2018). Additionally, pursuant to section 10-201(d) of the Act, LifeEnergy, as the appellant, bears the burden of proof on all issues in this appeal. 220 ILCS 5/10-201(d) (West 2018). Thus, the question is whether LifeEnergy has demonstrated prejudice in connection with the fact that the order initiating these proceedings did not specifically mention violations of sections 412.120(g) and 412.210 of Title 83 of the Code.

¶ 84    In its reply brief, LifeEnergy submits that it suffered prejudice based on what it "could" have done, "might" have done, or "would" have done if the initiating order mentioned violations of sections 412.120(g) and 412.210. According to LifeEnergy, this includes presenting unspecified "exculpatory evidence" or other evidence "contextualizing its conduct." During oral argument, LifeEnergy's counsel added that, had the Commission amended the initiating order to provide notice of violations of sections 412.120(g) and 412.210, LifeEnergy would have chosen to cross-examine Agnew rather than agree to a paper hearing and "probably" would have presented unspecified witnesses to testify that LifeEnergy did not have a managerial policy of violating the reapproach rule. LifeEnergy further maintains that, when determining whether it received proper notice, we should look to the Commission's initiating order, not the testimony or arguments presented by the Commission's staff.

¶ 85    These arguments are unpersuasive. LifeEnergy's contention that we should confine our inquiry to the initiating order is at odds with case law establishing that, "[i]n determining whether the respondent has adequate notice, the court may consider the discovery and other materials available to the respondent." *Siddiqui*, 307 Ill. App. 3d at 760. It is also at odds with the provision in section 10-101 of the Act that only prejudicial defects in notice justify reversal. As explained

above, Agnew's direct testimony put LifeEnergy on notice of its violations of sections 412.120(g) and 412.210, and LifeEnergy had three months to prepare its response to that testimony or raise an objection to proceeding in that manner. LifeEnergy now insists that it could have, might have, or would have litigated the case differently had the Commission amended the initiating order in response to Agnew's testimony. But the record gives rise to the inference that LifeEnergy knew that it faced penalties for its violations of sections 412.120(g) and 412.210 and that it strategically chose to concede those violations. Under these circumstances, LifeEnergy has not demonstrated that it was prejudiced by any deviation from the statutory requirements governing notice.

¶ 86    LifeEnergy briefly notes that section 10-108 of the Act authorizes the Commission to file complaints "setting forth any act or things done or omitted to be done in violation, or claimed to be in violation, of any provision of this Act, or of any order or rule of the Commission." 220 ILCS 5/10-108 (West 2018). Although the Commission disputes whether this statute applies to a proceeding initiated pursuant to section 10-101 of the Act, we need not resolve that issue. That is because LifeEnergy appears to concede that section 10-108 of the Act does not impose any additional requirements with respect to notice that could impact the result of this case. Specifically, in its opening brief, LifeEnergy asserts that section 10-108 of the Act "accords with" section 10-101 of the Act. In its reply brief, LifeEnergy proposes that "nothing turns" on whether this action is governed by section 10-108 of the Act.

¶ 87    LifeEnergy instead relies on *Black Hawk Motor Transit Co. v. Illinois Commerce Comm'n*, 398 Ill. 542 (1947), where our supreme court explained:

  " '[H]earings of the [C]ommission and orders entered in such matters shall be limited and circumscribed by the complaint filed. While the [C]ommission should be liberal in construing the pleadings before it, the statute requires that carriers shall be notified of the

complaint which they are required to answer, and though no particular form is prescribed there must be a statement of the thing which is claimed to be wrong, sufficiently plain to put the carrier upon its defense. The evidence should be limited by the issue made. The Commerce Commission cannot enter a valid order which is broader than the written complaint filed in the case.' " *Black Hawk*, 398 Ill. at 561 (quoting *Alton & Southern R.R. v. Illinois Commerce Comm'n*, 316 Ill. 625, 630 (1925)).

This language from *Black Hawk* does not compel reversal of the Commission's order. Liberally construing the initiating order, the Commission declared its intent to evaluate LifeEnergy's compliance with the totality of part 412 of Title 83 of the Code. The problem is not that the Commission ultimately entered a sanctions order that was broader than the initiating order, but rather that the very broad initiating order lacked specificity in some respects. As explained above, however, under the totality of the circumstances, any defects in the initiating order did not violate LifeEnergy's right to due process and do not otherwise demand reversal for failure to comply with the statutory scheme.

¶ 88                     B. Calculation of the Maximum Penalty

¶ 89    LifeEnergy next argues that the Commission imposed a penalty exceeding the maximum allowed by section 16-115B(b)(2) of the Act. The Commission responds, preliminarily, that LifeEnergy forfeited its arguments by failing to raise them in its application for rehearing.

¶ 90    Section 10-113(a) of the Act establishes that filing an application for rehearing before the Commission is a prerequisite to taking an appeal. 220 ILCS 5/10-113(a) (West 2018). To that end, "[n]o person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission." 220 ILCS 5/10-113(a) (West 2018). The purpose of this requirement is to make parties "point out mistakes of fact or law so that the

Commission will have an opportunity to correct any errors and, perhaps, avoid the need for judicial review." *Citizens Utility Board v. Illinois Commerce Comm'n*, 2015 IL App (2d) 130817, ¶ 44. "The allegations in an application for rehearing must be stated in unequivocal terms and be sufficiently specific to apprise the Commission and the opposing parties of the actual points relied upon." *Citizens Utility Board*, 2015 IL App (2d) 130817, ¶ 44.

¶ 91 When a party fails to raise an argument in its application for rehearing, that argument is forfeited for purposes of appeal. *Citizens Utility Board*, 2015 IL App (2d) 130817, ¶ 44. This is true even where a party alleges that the Commission acted beyond its statutory authority. See *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 136 (1995) ("Because CUB's petition for rehearing did not argue a lack of statutory authority as grounds for finding the rider illegal, this contention is also waived in the present appeal."); *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 710 (1997) ("[W]here a petitioner, in its application for rehearing, asserts only that the Commission erred as a matter of law, but does not expressly challenge the Commission's decision as beyond its statutory authority, such argument will be deemed waived for purposes of review.").

¶ 92 In a case that did not involve allegations that the Commission acted beyond its authority, our supreme court explained that, because parties failed to "strictly comply" with section 10-113(a) of the Act by including a particular argument in their applications for rehearing, the appellate court lacked jurisdiction to overlook the forfeiture and consider that argument. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 46. According to the court, appeals of orders entered by the Commission are matters of "special statutory jurisdiction," so the oft-repeated maxim that "forfeiture is a limitation on the parties" does not apply. *Madigan*, 2015 IL 116005, ¶ 46.

¶ 93 The jurisdictional impediment to overlooking forfeiture that the supreme court identified in *Madigan* would not seem to apply, however, where a party argues that the Commission acted beyond its authority. To the contrary, it seems we are obligated to consider the argument because, "to the extent an agency acts outside its statutory authority, it acts without jurisdiction." *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243 (1989). Where an agency " ' "lacks the inherent power to make or enter the particular order involved," ' " the order is void and " ' "may be attacked at any time or in any court, either directly or collaterally." ' " (Emphasis omitted.) *Business & Professional People*, 136 Ill. 2d at 243-44 (quoting *City of Chicago v. Fair Employment Practices Comm'n*, 65 Ill. 2d 108, 112-13 (1976), quoting *Barnard v. Michael*, 392 Ill. 130, 135 (1945)).

¶ 94 LifeEnergy did not argue in its application for rehearing that the $1 million penalty exceeded the maximum authorized by section 16-115B(b)(2) of the Act. Although LifeEnergy forfeited this argument, LifeEnergy frames its argument as a challenge to the Commission's jurisdiction. The Commission accuses LifeEnergy of "styling its run-of-the-mill statutory interpretation argument as jurisdictional." We disagree. If the Commission imposed a financial penalty that exceeded the maximum allowed by statute, then it acted "outside its statutory authority" and its order would be void. See *Business & Professional People*, 136 Ill. 2d at 243. Unlike the cases that the Commission cites, LifeEnergy is challenging the scope of the agency's power to act, not just identifying irregularities or defects in the process of exercising its power. See *Newkirk v. Bigard*, 109 Ill. 2d 28, 40 (1985) (an agency's failure to include a required provision in an order rendered that order voidable, not void); *Illini Coach Co. v. Illinois Commerce Comm'n*, 408 Ill. 104, 110 (1951) (the Commission's alleged failure to review the record before entering its

judgment did not render the judgment void). Accordingly, we will consider the merits of LifeEnergy's argument to determine whether the order was void.

¶ 95    LifeEnergy's argument presents issues of statutory interpretation. Interpreting a statute involves a question of law, which we review *de novo*. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 522 (2009). In reviewing a statute, our primary goal is "to ascertain and implement the will of the legislature." *Commonwealth Edison*, 398 Ill. App. 3d at 522. If a statute is ambiguous, meaning that "it may be reasonably read as expressing multiple meanings," then we will accord "considerable deference to an agency charged with implementing it." *Commonwealth Edison*, 398 Ill. App. 3d at 523.

¶ 96    Section 16-115B(b)(2) of the Act allows the Commission to impose penalties "not to exceed (i) $10,000 per occurrence or (ii) $30,000 per day for those violations or non-conformances which continue after the Commission issues a cease and desist order." 220 ILCS 5/16-115B(b)(2) (West 2018). In calculating the maximum penalty, the Commission determined that the approach advocated by its staff was reasonable, except for the staff's suggestion that section 5-202 of the Act established a $500,000 cumulative-penalty limit for continuing violations of the rules. The Commission's staff, in turn, calculated the maximum penalties against LifeEnergy as follows:

> 55 days of violating section 412.170(e) of Title 83 of the Code by failing to train agents and certify such training. Each day constituted an "occurrence," for a total of $550,000 ($10,000 x 55).

> 146 days of violating the reapproach rule of section 412.120(g) through a managerially sanctioned practice. Each day constituted an "occurrence," for a total of $1,460,000 ($10,000 x 146).

5 enrollments that violated the verification requirements of section 412.120(g). Each enrollment constituted an "occurrence," for a total of $50,000 ($10,000 x 5).

7 enrollments that violated section 412.210 because LifeEnergy failed to complete customers' requests to rescind sales contracts. Each enrollment constituted an "occurrence," for a total of $70,000 ($10,000 x 7).

¶ 97    LifeEnergy challenges the way that the Commission calculated the maximum penalties for its violations of sections 412.170(e) and 412.120(g) of Title 83 of the Code. We will address these arguments separately.

¶ 98                                    1. *Section 412.170(e)*

¶ 99    LifeEnergy argues that the Commission cannot impose per-day penalties for violations of section 412.170(e) of Title 83 of the Code. According to LifeEnergy, there are four reasons that "[t]he failure to timely train salespeople and provide a corresponding certification constitutes a single 'occurrence.' " The first reason is that some dictionaries define "occurrence" as "[s]omething that happens or takes place" (Black's Law Dictionary (11th ed. 2019)) or "[a] thing that occurs, happens, or takes place; an event, an incident" (Oxford English Dictionary (3d ed. 2004)). Thus, by LifeEnergy's logic, LifeEnergy violated the training and certification requirements of section 412.170(e) only once: "on May 1, 2018, when it missed the deadline to train its salespeople and notify the Commission accordingly." LifeEnergy submits that it would defy common sense and proper English "to say that every day of an ongoing failure to rectify a deficiency is actually a series of daily 'events' that 'happen' over and over again."

¶ 100   The second reason LifeEnergy proposes for why there was only one "occurrence" here in relation to its violation of section 412.170(e) of Title 83 of the Code is that it would be "nonsensical" to rule otherwise in light of the statutory text. LifeEnergy notes that the legislature

provided for per-day penalties once the Commission issues a cease-and-desist order; prior to issuing such order, however, the penalties are "per occurrence." LifeEnergy submits that, because the legislature used the phrases "per day" and "per occurrence" in the same statute, it would not make sense to conclude that "occurrence" means "day."

¶ 101   For its third reason why there was only one "occurrence" here in relation to its violation of section 412.170(e) of Title 83 of the Code, LifeEnergy finds guidance in section 5-202 of the Act. LifeEnergy acknowledges that section 5-202 of the Act does not apply here, as that statute applies only when penalties are "not otherwise provided for" in the Act. See 220 ILCS 5/5-202 (West 2018). Nevertheless, LifeEnergy deems it significant that section 5-202 allows for per-day penalties but imposes a $500,000 cumulative-penalty limit for continuing violations. According to LifeEnergy, section 5-202 of the Act thus "confirms that the General Assembly did not authorize the Commission to impose a never-ending series of $10,000-per-day fines, even in the rare cases in which the General Assembly thought it appropriate to allow for per-day penalties."

¶ 102   The fourth reason LifeEnergy proposes for why there was only one "occurrence" here in relation to its violation of section 412.170(e) of Title 83 of the Code is that "Illinois law as a whole confirms that 'per occurrence' cannot be read to mean 'per day.' " In support of this contention, LifeEnergy cites five statutes that are unrelated to the issues in this case but allow for penalties "per occurrence." In LifeEnergy's view, these statutes "illustrate that the General Assembly considers a continuing violation or failure to be a single occurrence unless otherwise specified."

¶ 103   Ultimately, LifeEnergy argues that section 16-115B(b)(2) of the Act is unambiguous, so we need not defer to the Commission's contrary interpretation.

¶ 104   The Commission responds that "[t]he statute is ambiguous as it pertains to 'per occurrence,' " as an "occurrence" could be read to mean either (1) each day, (2) each unlawful

enrollment, or (3) each ineligible sales agent that LifeEnergy allowed to market or sell electricity. The Commission argues that it properly interpreted section 16-115B(b)(2) of the Act in the first manner. According to the Commission, neither section 5-202 of the Act nor the other statutes that LifeEnergy cites in its brief compel a contrary reading of section 16-115B(b)(2). The Commission maintains that its interpretation of what constitutes an "occurrence" is reasonable, is consistent with the legislature's objectives, and is entitled to substantial deference.

¶ 105 We hold that section 16-115B(b)(2) of the Act is ambiguous as to what constitutes an "occurrence" when an ARES violates section 412.170(e) of Title 83 of the Code by failing to train its agents and certify such training to the Commission. There are multiple plausible ways to construe an "occurrence" as it applies to such facts. At one extreme, one could argue, as LifeEnergy does, that there is only one occurrence, subject to a single $10,000 penalty, no matter how many days the violation lasts, how many untrained agents the ARES employs, or how many customers such agents contact or enroll. At the other extreme, one could argue that there is a separate occurrence each time that an ARES's untrained/uncertified agent enrolls or contacts a customer. Although the record does not reflect the number of customers that LifeEnergy's agents contacted during the 55-day period of noncompliance, considering that LifeEnergy's agents enrolled more than 1400 customers, either interpretation would leave the door open for astronomical maximum penalties. One could also reasonably argue that each agent who was not properly trained or whose training was not certified to the Commission represented an occurrence. Alternatively, one could reasonably take the position that the Commission advocates—that each day of noncompliance constitutes a separate occurrence. The dissenting commissioners also outlined a reasonable argument that LifeEnergy was subject to two separate penalties for its

distinct violations of section 412.170(e) of Title 83 of the Code: one for failing to train its agents and one for failing to certify such training to the Commission.

¶ 106   None of these interpretations are foreclosed by the plain language of section 16-115B(b)(2) of the Act. The dictionary definitions that LifeEnergy offers do not provide much insight. To say that an "occurrence" is an event or something that happens does not negate the possibility that there were multiple occurrences under the facts of this case. LifeEnergy insists that there was a single event here that merely went unrectified for a period of time. That is one plausible way to view the case. Another possibility is that there were multiple events when, day after day, LifeEnergy's agents contacted and enrolled customers without having received updated training and without any training having been certified to the Commission.

¶ 107   LifeEnergy argues that the Commission may impose per-day penalties only after issuing a cease-and-desist order. The statutory text does not require that conclusion. Again, section 16-115B(b)(2) allows for penalties "not to exceed (i) $10,000 per occurrence or (ii) $30,000 per day for those violations or non-conformances which continue after the Commission issues a cease and desist order." 220 ILCS 5/16-115B(b)(2) (West 2018). In a situation that arguably involves a very large number of occurrences over a period of weeks or months, it is reasonable to conclude that an ARES may be fined $10,000 per day before a cease-and-desist order issues and $30,000 per day thereafter.

¶ 108   Furthermore, section 5-202 of the Act does not compel a conclusion that LifeEnergy's interpretation of section 16-115B(b)(2) is the only correct one. Section 5-202 of the Act applies when penalties are "not otherwise provided for" in the Act. 220 ILCS 5/5-202 (West 2018). As LifeEnergy acknowledges, section 16-115B(b)(2) of the Act contains its own penalty provision, so section 5-202 does not apply. Had the legislature intended to limit cumulative per-day penalties

assessed pursuant to section 16-115B(b)(2) of the Act, it could have made that explicit in the statute.

¶ 109　Finally, LifeEnergy's citation of inapposite statutes is unpersuasive. The statutes do not support LifeEnergy's broad contention that "the General Assembly considers a continuing violation or failure to be a single occurrence unless otherwise specified."

¶ 110　Because reasonable minds can differ about how many separate "occurrences" were implicated by the facts of this case, the statute is ambiguous. See *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 132011, ¶ 21 ("A statute is ambiguous if its meaning cannot be interpreted from its plain language or if it is capable of being understood by reasonably well-informed persons in more than one manner."). In this situation, we must accord "substantial weight and deference" to the Commission's interpretation, as it is "the agency charged with the administration and enforcement of the statute." *Commonwealth Edison*, 2014 IL App (1st) 132011, ¶ 20. Accordingly, we hold that Life Energy has not shown that the Commission exceeded its authority by imposing a penalty greater than the maximum allowed by law.

¶ 111　　　　　　　　　　　　　　*2. Section 412.120(g)*

¶ 112　LifeEnergy also challenges the way that the Commission dealt with the violations of section 412.120(g) of Title 83 of the Code.

¶ 113　LifeEnergy first argues that the Commission erroneously assessed penalties on a per-day basis for the failure to perform third-party verifications. This argument is based on an incorrect premise. The Commission accepted its staff's calculations and recommendations regarding penalties, except for the staff's suggestion that section 5-202 of the Act established a $500,000 cumulative-penalty limit for continuing violations. LifeEnergy violated section 412.120(g) in two separate ways. The first was through its managerially sanctioned practice regarding LifeEnergy's

agents reapproaching customers. For this set of violations, the Commission's staff recommended per-day penalties. The other set of violations related to agents enrolling customers without proper verification. Contrary to what LifeEnergy argues, the Commission's staff did not recommend per-day penalties for this set of violations. The staff instead recommended penalizing LifeEnergy a maximum of $50,000 for five enrollments, with each enrollment constituting an occurrence. There being no indication that the Commission imposed per-day penalties for the violations of the verification requirements, LifeEnergy's arguments fail.

¶ 114   LifeEnergy also contends that it did not violate any regulation when it stopped tracking consumer complaints in a central database on June 15, 2018. This argument is a nonissue, as the Commission did not penalize LifeEnergy for its failure to track consumer complaints.

¶ 115   LifeEnergy raises a new argument in its reply brief—that the word "occurrence" in section 16-115B(b)(2) of the Act does not allow for per-day penalties for managerially sanctioned violations of the reapproach rule. LifeEnergy forfeited this argument by failing to raise it in its opening brief. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points raised for the first time in a reply brief are forfeited).

¶ 116            C. Whether the $1 Million Penalty Is Arbitrary and Capricious

¶ 117   LifeEnergy next argues that the $1 million penalty is arbitrary and capricious. LifeEnergy asserts that four factors must guide the Commission in exercising its discretion when assessing a penalty: (1) the size of the business involved, (2) the gravity of the violation, (3) mitigating or aggravating factors, and (4) the good faith of the regulated entity in attempting to achieve compliance after being notified of a violation. See 220 ILCS 5/4-203(a) (West 2018). LifeEnergy insists that the Commission may not assess a penalty for purely punitive purposes and that any penalty must aid in the enforcement of the regulations.

¶ 118   Against this backdrop, LifeEnergy argues that three of the Commission's findings of fact were against the manifest weight of the evidence. First, LifeEnergy argues that there was no basis for the Commission's finding that LifeEnergy harmed both Illinois consumers and the Illinois retail market. Second, LifeEnergy challenges the evidence supporting the Commission's finding that LifeEnergy had a managerially sanctioned practice of violating the reapproach rule of section 412.120(g) of Title 83 of the Code. Third, LifeEnergy criticizes the Commission's conclusion that LifeEnergy's conduct in commencing agent training within six days of receiving the NOAV was "a business decision in the effort to make its assets more marketable and less exposed to liability in its sales negotiations with NRG."

¶ 119   LifeEnergy further argues that the Commission's application of facts to the controlling legal standards was clearly erroneous. LifeEnergy asserts that there was no basis for imposing any financial penalty. Among LifeEnergy's specific contentions in support of this argument are that the Commission (1) "did not bother to make an on-the-record examination" of LifeEnergy's size as a company, (2) "did not even try to quantify the impact on consumers registered by untrained agents or on the energy market as a whole," and (3) failed to consider that, in other dockets involving an ARES, it had approved settlements that did not include penalties. LifeEnergy maintains that its agreement to refund customers and exit the Illinois market militates against imposing a financial penalty. LifeEnergy further argues that it acted in good faith to achieve compliance quickly once it received notice of the violations.

¶ 120   Finally, LifeEnergy contends that, even if some financial penalty were warranted, there was no basis for imposing a $1 million penalty. In support of this argument, LifeEnergy asserts that the only potential harm to consumers was approximately $34,000, and the $1 million penalty

was "over twenty-nine times that amount." Ultimately, LifeEnergy submits that the Commission meant to "send a message" to other companies, which is impermissible.

¶ 121   LifeEnergy's arguments challenge whether the Commission's findings were "supported by substantial evidence," which is a proper basis for review. See 220 ILCS 5/10-201(e)(iv)(A) (West 2018). "Substantial evidence is evidence that one would generally accept as sufficient to support a particular conclusion." *Citizens Utility Board*, 2015 IL App (2d) 130817, ¶ 46. This means "more than a mere scintilla" but "less than a preponderance of the evidence." *Citizens Utility Board*, 2015 IL App (2d) 130817, ¶ 46. When determining whether substantial evidence supported the Commission's findings of fact, we will uphold the findings unless they are against the manifest weight of the evidence. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL App (1st) 150425, ¶ 17. "Findings of fact are deemed contrary to the manifest weight of the evidence only when an opposite conclusion is clearly evident from the record." *Commonwealth Edison*, 2016 IL App (1st) 150425, ¶ 17. We may neither reevaluate the credibility or weight of the evidence nor substitute our judgment for the Commission's. *Commonwealth Edison*, 2016 IL App (1st) 150425, ¶ 17.

¶ 122   When a party argues that a financial penalty imposed by an administrative agency is excessive, we will reverse the sanction only "if it is arbitrary or capricious or amounts to an abuse of discretion." *Gruwell v. Department of Financial & Professional Regulation*, 406 Ill. App. 3d 283, 295 (2010). A sanction is arbitrary or capricious where " ' "the agency contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an explanation which is so implausible that it runs contrary to agency expertise." ' " *Gruwell*, 406 Ill. App. 3d at 295 (quoting *Deen v. Lustig*, 337 Ill. App. 3d 294, 302 (2003)). An abuse of discretion means that the

agency reached its decision without employing conscientious judgment or the decision was clearly against logic. *Gruwell*, 406 Ill. App. 3d at 295.

¶ 123   One of the premises underlying LifeEnergy's arguments is that case law prohibits the Commission from sanctioning an ARES that voluntarily ceases operations in Illinois. According to LifeEnergy, sanctioning an ARES under such circumstances would be purely punitive and would not aid in the enforcement of the Act. In support of this argument, LifeEnergy relies primarily on older cases addressing penalties assessed by the Illinois Pollution Control Board. Assuming, without deciding, that this body of case law applies to proceedings before the Commission, none of these cases purported to establish a categorical bar against imposing a financial penalty on a company that ceases operations. Instead, each of the cases turned on its own facts.

¶ 124   For example, *Southern Illinois Asphalt Co. v. Pollution Control Board*, 60 Ill. 2d 204 (1975), involved penalties assessed against two different companies. The penalty against Southern Illinois Asphalt Company, Inc. (Southern), related to its failure to procure a permit before operating an asphalt plant. Among the reasons why our supreme court vacated this penalty was that "[t]here was no need to assess a penalty in aid of the enforcement of the [Environmental Protection] Act because Southern had ceased operating prior to the filing of the complaint." *Southern Illinois Asphalt*, 60 Ill. 2d at 210. Additional reasons that the court cited included that (1) Southern was not charged with being a polluter, (2) its emissions were well below regulatory standards, (3) the plant operated for only three months, (4) Southern's failure to obtain a permit was "pure inadvertence" because Southern believed that its supplier had applied for the permit, and (5) Southern promptly applied for a permit when it learned that the supplier had not done so. *Southern Illinois Asphalt*, 60 Ill. 2d at 210-11.

¶ 125   By contrast, LifeEnergy did not cease operating before the Commission filed its complaint. LifeEnergy's regulatory violations also were not inadvertent. We need not unnecessarily prolong this disposition by addressing each of the cases that LifeEnergy cites where courts reversed financial penalties imposed by administrative agencies. Again, it will suffice to say that each case turned on its own facts and none held that it is categorically impermissible to penalize a company that ceases operations in Illinois.

¶ 126   Furthermore, the case law that LifeEnergy cites does not indicate that deterring similar misconduct by other companies is an improper consideration. To the contrary, in *Southern Illinois Asphalt*, our supreme court said:

> "Arguably, the imposition of a civil penalty for each violation may deter further violations by the one penalized or by others, thus aiding in the administration of the Act. However, the Pollution Control Board itself has recognized that the arbitrary imposition of penalties can in fact hinder the fulfillment of the purpose of the Act." *Southern Illinois Asphalt*, 60 Ill. 2d at 209.

In other words, while deterrence is a relevant consideration, an agency's decision to impose sanctions may be arbitrary and capricious if the circumstances presented still militate against a penalty.

¶ 127   LifeEnergy asserts that, because section 4-203(a) of the Act lists factors to consider when assessing a financial penalty, the Commission was not permitted to consider "extra-statutory factors," such as the need to deter future misconduct by other companies. LifeEnergy failed to urge this point in its application for rehearing, so we will not consider the argument. See 220 ILCS 5/10-113(a) (West 2018) ("No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission.").

¶ 128   The three specific findings of fact that LifeEnergy challenges were not against the manifest weight of the evidence. Agnew's testimony provided a sufficient basis for the Commission's conclusion that LifeEnergy harmed Illinois consumers and the retail market. Specifically, Agnew testified that the impetus for the 2017 amendments to part 412 of Title 83 of the Code was "persistent consumer complaints received by CSD involving either confusion or alleged deception about the offers and/or the nature of the transactions." According to Agnew:

"An improperly managed sales team going door-to-door, equipped with confusing marketing materials, untrained on the amended Part 412, and directed by LifeEnergy to return to consumers' houses immediately after a failed TPV in violation of Part 412.120(g) impacts not only every consumer enrolled, but also every consumer with whom they come in contact. The 'gravity' of this impact is also felt by LifeEnergy's peers in the retail market that had structured their sales campaigns to be fully compliant. In addition to enjoying the unfair competitive advantage of acquiring customers in violation of the amended Part 412, LifeEnergy's practices negatively impact the public's overall perception of the retail energy market."

Accordingly, evidence in the record supports the Commission's conclusions about the extent of harm caused by LifeEnergy's noncompliance with regulations.

¶ 129   Agnew's testimony likewise supported the Commission's finding that LifeEnergy had a managerially sanctioned practice of violating the reapproach rule of section 412.120(g) of Title 83 of the Code. Agnew identified 20 occasions on which LifeEnergy's agents improperly attempted multiple third-party verifications with customers within 24 hours. Agnew testified that the Commission's staff asked LifeEnergy why some customers' names appeared multiple times on a

spreadsheet detailing customer enrollments. LifeEnergy provided the following response to that inquiry:

"If the sale was classified as a 'No Sale', [*sic*] the sales agent is notified of the failed TPV in real time via their enrollment tablet, and depending on the No Sale disposition reason, will attempt to revisit and re-educate the customer allowing them to attempt the TPV process again. As a result, the customer's name \*\*\* is listed more than once, with ultimately one 'good sale' disposition identified under column 'status_txt.' "

According to Agnew, this response suggested that LifeEnergy had a managerially sanctioned practice of violating the reapproach rule. Given that (1) the Commission's staff identified 20 separate violations of the reapproach rule and (2) LifeEnergy's response quoted above arguably conveyed the sentiment that it encouraged its agents to "revisit and re-educate" customers *immediately* after a failed third-party verification, the Commission's conclusion on this point was not against the manifest weight of the evidence.

¶ 130   LifeEnergy emphasizes that its training materials properly identified the reapproach rule. To the extent that there was a conflict in the evidence regarding whether LifeEnergy had a managerially sanctioned practice, the Commission resolved that conflict against LifeEnergy. We remain mindful that LifeEnergy bears the burden of showing that "the opposite conclusion is clearly evident," not just that "the evidence presented may support a different conclusion." *Citizens Utility Board*, 2015 IL App (2d) 130817, ¶ 47.

¶ 131   The third factual finding that LifeEnergy challenges relates to its good faith. The Commission recognized that LifeEnergy was willing to refund its customers and was "reasonable" in commencing agent training within six days of receiving the NOAV. Nevertheless, the Commission was "not persuaded that such behavior was entirely a good faith effort to mitigate

violations, rather than a business decision in the effort to make its assets more marketable and less exposed to liability in its sales negotiations with NRG." The Commission's skepticism of LifeEnergy's motives had a basis in the evidence, as LifeEnergy's expression of its willingness to refund its customers came around the time when the company was in the process of selling its assets.

¶ 132   We also reject LifeEnergy's argument that the Commission's order is subject to reversal for failing to elaborate on some of its reasoning or to consider all factors listed in section 4-203(a) of the Act. The Commission "is not required to make particular findings as to each evidentiary fact or claim" but instead "must sufficiently set forth the facts found which form the basis for the order to enable a court to intelligently review them on appeal." *Lefton Iron & Metal Co. v. Illinois Commerce Comm'n*, 174 Ill. App. 3d 1049, 1055 (1988). Here, the Commission sufficiently set forth its reasoning and findings of fact. Specifically, the Commission adequately explained its reasoning as to how LifeEnergy's conduct affected the broader retail energy market. As noted above, Agnew's testimony provided evidentiary support for the Commission's conclusions on that point. Moreover, contrary to LifeEnergy's argument that the Commission failed to consider LifeEnergy's size as a business, the Commission explicitly stated in its order: "Based on the evidence in the record, the appropriateness of the penalty to the size of the business and the gravity of violations, the Commission assesses a penalty of $1,000,000 (one million)." The Commission continued:

"In determining the appropriateness of the penalty to the size of the business, the Commission takes into account not just the customers that LifeEnergy was able to enroll, but also all the customers that were marketed to in Illinois, as well as all other customers

in Illinois that the Company could have marketed to under its Certificate of Service of Authority."

Thus, the Commission confirmed that it considered LifeEnergy's size as a business.[1] In its brief on appeal, LifeEnergy makes a passing reference to the ALJ's comment that a penalty should be commensurate with what a company can pay. To the extent that LifeEnergy is insinuating that it does not have the means to pay a $1 million penalty, we note that LifeEnergy never raised that argument before the Commission.

¶ 133   LifeEnergy notes that, in the past, the Commission has approved settlements that did not include penalties. However, none of those dockets involved violations of the 2017 amendments to part 412 of Title 83 of the Code. Additionally, the companies in those dockets did not admit to violating any regulations, and the orders approving the settlements did not include detailed recitations of the evidence. Thus, it is impossible for us to determine whether those dockets present fair comparisons to the present one.

¶ 134   The ultimate question, then, is whether the circumstances justified the Commission in imposing a $1 million penalty against LifeEnergy. We hold that they did. The evidence showed

---

[1] The record provides some context about LifeEnergy's size as a business, such as its territorial authority in Illinois and its 2017 revenue from its Illinois operations. The record also indicates that LifeEnergy did business in other states and that it was "part of LS Power," which LifeEnergy claimed in its marketing materials was "one of the leading independent owners and developers of power plants and transmission infrastructure in the U.S." Additionally, in one of its briefs before the Commission, LifeEnergy made a representation about the number of Illinois customers it had.

that, in late 2017, the Commission revised its regulations pertaining to how an ARES may market and sell electricity in Illinois. These were important consumer-protection measures that sought, in part, to prevent any ARES from marketing and selling electricity under misleading pretenses. According to Agnew, prior to the amendments, LifeEnergy's volume of complaints made it one of the "poorest performers" in the market in that regard.

¶ 135  LifeEnergy had notice of the 2017 regulatory changes and had six months to prepare for them before they took effect on May 1, 2018. There is little indication as to what, if anything, LifeEnergy did to prepare for these regulatory changes prior to Dearman starting his employment with LifeEnergy in March or April 2018.

¶ 136  LifeEnergy did not comply with the regulatory changes by the May 1, 2018, deadline. If time constraints made compliance difficult, LifeEnergy could have chosen to pause its marketing and sales efforts until it had an opportunity to comply with the regulations. LifeEnergy instead chose to continue its operations on the unfounded hope or expectation that the Commission would provide some undefined grace period before commencing enforcement efforts. Even after the Commission's staff issued a NOAV, LifeEnergy did not pause its marketing and sales efforts pending compliance with regulations. Instead, LifeEnergy continued to allow its agents to market and sell energy before the required training and certifications were completed.

¶ 137  Aside from LifeEnergy's violations of training and certification requirements, the Commission's staff unearthed other violations. These included a repeated failure to adhere to the reapproach rule, allowing in-person solicitation of enrollments to occur without proper verification, and failing to timely process customers' requests to rescind their enrollments.

¶ 138  Under these circumstances, the Commission was justified in concluding that LifeEnergy's actions warranted a substantial financial penalty. Unlike many of the cases LifeEnergy cites, this

is not a situation where the violations were merely technical, inadvertent, unrelated to the core purposes of the regulation, or isolated incidents. The record shows that the Commission evaluated the facts carefully and considered how to fashion an appropriate penalty. The $1 million penalty is justified by substantial evidence and is neither arbitrary, capricious, nor an abuse of discretion.

¶ 139                    D. Postdecisional Evidence and Submissions

¶ 140   As its final argument, LifeEnergy maintains that the Commission exceeded its authority by ordering postdecisional evidence and submissions regarding customer refunds. LifeEnergy emphasizes that no party sought clarification regarding LifeEnergy's calculations of customer refunds until after the evidentiary record was closed. LifeEnergy notes that, if the Commission wanted clarification, prior to issuing the final order, the Commission could have requested that the ALJ develop the record in accordance with sections 200.870 and 200.875 of Title 83 of the Code (83 Ill. Adm. Code 200.870 (1986); 83 Ill. Adm. Code 200.875 (1994)). According to LifeEnergy, instead of the Commission availing itself of those procedures, the Commission improperly made a decision on the merits and then directed the parties, in LifeEnergy's words, "to file information to retroactively support that decision." LifeEnergy contends that this violates section 10-103 of the Act, which states that the Commission's decision "shall be based exclusively on the record for decision in the case." 220 ILCS 5/10-103 (West 2018). Finally, according to LifeEnergy, requiring postorder evidentiary proceedings cannot be justified by the Commission's authority to reopen proceedings pursuant to section 200.900 of Title 83 of the Code (83 Ill. Adm. Code 200.900 (2019)).

¶ 141   The Commission denies that it required postorder evidentiary proceedings. Instead, according to the Commission, it merely directed LifeEnergy to make a compliance filing, which purportedly is "an established procedure the Commission uses to, among other things, verify that

a company accurately implements what the Commission ordered." The Commission submits that LifeEnergy's filing will "allow the Commission to verify whether the refund amount complied with the Order and, if not, to take further action, such as order rehearing" pursuant to section 10-113 of the Act. According to the Commission, its directive was not "for the purpose of resolving any dispute of material fact regarding the calculation."

¶ 142   The Commission also maintains that it made its decision based on evidence in the record. Moreover, the Commission asserts that LifeEnergy forfeited its argument that the Commission violated sections 200.870 and 200.875 of Title 83 of the Code, as LifeEnergy failed to raise that specific point in its application for rehearing. Should we deem that argument preserved, the Commission proposes that, even without invoking the procedures of those sections, it had the authority to grant a rehearing on its own motion and to take additional evidence.

¶ 143   As an initial matter, we deem LifeEnergy's arguments preserved for review. Although LifeEnergy did not cite every regulation in its application for rehearing that it cites on appeal, LifeEnergy made the same general arguments. As mentioned earlier, "[t]he allegations in an application for rehearing must be stated in unequivocal terms and be sufficiently specific to apprise the Commission and the opposing parties of the actual points relied upon." *Citizens Utility Board*, 2015 IL App (2d) 130817, ¶ 44. LifeEnergy met this standard.

¶ 144   In its final order, the Commission indicated that LifeEnergy "should" and "shall" refund its customers $34,178.20 within 45 days of the order. Then, within 30 days of issuing such refunds, LifeEnergy had to file "proof of the distribution of refunds." The order also required LifeEnergy to "file within this docket both confidential and public redacted versions of the customer list and the proposed voluntary refunds for the identified customers" within 10 days of the order. In such filing, LifeEnergy would have to explain "how the customer was identified, the amount the

customer is refunded, how the refund amount was calculated, and the timeframe during which the customer was enrolled with LifeEnergy." The order provided that any party could object to inaccuracies in LifeEnergy's calculations within 30 days of the entry of the order. In the event of an objection, the Commission directed its staff to file, within 40 days of the entry of the order, "a recommendation on how to proceed."

¶ 145   The Commission's directive for LifeEnergy to submit proof of the issuance of refunds totaling $34,178.20 was a mere compliance filing, and LifeEnergy does not contend otherwise. The remainder of the directive, however, went beyond that. The Commission insists that it did not order the filing "for the purpose of resolving any dispute of material fact regarding the calculation" of the refunds. But that is exactly what the order did. The Commission noted potential inaccuracies in LifeEnergy's calculations yet said that LifeEnergy "should" and "shall" refund its customers $34,178.20, the amount that LifeEnergy calculated. The Commission then required LifeEnergy to justify its calculations and gave the Commission's staff and the CUB leave to object to such calculations. This aspect of the order cannot be characterized as a mere compliance filing. The Commission instead invited further evidence and proceedings to confirm the accuracy of LifeEnergy's calculations, despite having entered a final decision on the merits and directing LifeEnergy to refund its customers a specific amount.

¶ 146   The question becomes whether the Commission had the authority to do this. "Agencies have no inherent or common-law power; they are creatures of statute that have only the power that their legislative creators gave them." *Mercury Sightseeing Boats, Inc. v. County of Cook*, 2019 IL App (1st) 180439, ¶ 55. The only statute that the Commission cites to justify its actions is its power to amend orders on its own motion. Specifically, section 10-113(a) of the Act provides, in relevant portion, that "the Commission may at any time, upon notice to the public utility affected, and after

opportunity to be heard as provided in the case of complaints, rescind, alter or amend any rule, regulation, order or decision made by it." 220 ILCS 5/10-113(a) (West 2018). "Section 10-113 is a formal procedure the Commission must follow if it intends to rescind, alter or amend one of its decisions." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 378 (2008).

¶ 147   Here, the Commission did not state that it intended to rely on its authority under section 10-113(a) of the Act to rescind, alter, or amend its final order. Indeed, it would make no sense for the Commission to exercise its power to rescind, alter, or amend an order as soon as it was entered. LifeEnergy also makes a compelling argument that the Commission could have ordered additional proceedings before entering a final order if the Commission wanted to confirm LifeEnergy's calculations. The Commission has not cited any authority giving it the power to enter a final order that includes a requirement for a party to submit additional materials that could have been presented and considered prior to the entry of the order. We note that the case that the Commission cites, *Moncada v. Illinois Commerce Comm'n*, 212 Ill. App. 3d 1046 (1991), is distinguishable, as that case discussed the nature of the Commission's powers *before* entering a final order.

¶ 148   Accordingly, we hold that the Commission exceeded its authority by (1) requiring LifeEnergy to file its customer list and proposed voluntary refunds after the final order was entered, (2) allowing parties to then object to any inaccuracies in LifeEnergy's calculations, and (3) directing the Commission's staff to make recommendations as to how to proceed in light of any discrepancies that might be identified in LifeEnergy's calculations. Those portions of the order are vacated. The remaining portions of the Commission's order shall remain intact, including LifeEnergy's obligation to refund its customers $34,178.20 and to submit proof of compliance with that obligation.

¶ 149                                    III. CONCLUSION

¶ 150   For the reasons stated, we affirm in part and vacate in part the order entered by the Illinois Commerce Commission.

¶ 151   Commission decision affirmed in part and vacated in part.

---

**No. 2-20-0411**

---

| | |
|---|---|
| **Cite as:** | *LifeEnergy, LLC v. Illinois Commerce Comm'n*, 2021 IL App (2d) 200411 |

---

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, No. 18-1540. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Clifford W. Berlow, E. Glenn Rippie, and Marjorie R. Kennedy, of Jenner & Block LLP, of Chicago, for petitioner. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert W. Funk, Thomas R. Stanton, and Rebecca L. Segal, Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission. |
| | No brief filed for other respondent. |

---